403 F.2d 169
 ANTI-DEFAMATION LEAGUE OF B'NAI B'RITH, PACIFIC SOUTHWEST REGIONAL OFFICE, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Trans American Broadcasting Corporation, Intervenor.
 No. 20770.
 United States Court of Appeals District of Columbia Circuit.
 Argued October 26, 1967.
 Decided September 30, 1968.
 Certiorari Denied March 24, 1969.
 
 See 89 S.Ct. 1190.
 Mr. Harry M. Plotkin, Washington, D.C., with whom Messrs. George R. Kucik and David A. Brody, Washington, D.C., were on the brief, for appellant.
 Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, Stuart F. Feldstein and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.
 Mr. Mark E. Fields, Washington, D.C., with whom Mr. Samuel Miller, Washington, D.C., was on the brief, for intervenor.
 Before WILBUR K. MILLER, Senior Circuit Judge, and BURGER and WRIGHT, Circuit Judges.
 BURGER, Circuit Judge:
 
 
 1
 The Federal Communications Commission granted renewal of the license of Trans American Broadcasting Company for Station KTYM, Inglewood, California. Appellant, the Anti-Defamation League, opposed renewal claiming that certain programs of the Licensee had contained anti-Semitic material. After investigation of these charges renewal was granted without an evidentiary hearing on Appellant's opposition.
 
 
 2
 The material challenged as anti-Semitic originated in certain 15 minute paid-time programs under the control of a commentator, one Richard Cotten. The Commission readily acknowledges that on several of Cotten's 15 minute programs of commentary he made offensive comments concerning persons of the Jewish faith, equating Judaism with Socialism and Socialism with Communism. Two broadcasts, one on October 7, 1964, and one on May 27, 1965, were singled out and transcripts of those programs were before the Commission. The League's complaint is that the Licensee did nothing to remedy these programs until the programs were called to its attention and then declined either to cancel the program or to control Cotten in any way. The Licensee then offered the League free equal time to respond to Cotten's paid broadcasts or use the time in any way it desired. The League advised the Commission that it would not accept the tender of free time.
 
 
 3
 In granting renewal of the KTYM license without conducting an evidentiary hearing on the content of Cotten's programs, the Commission explained that no dispute of fact as to the content of the Cotten program existed and no issue as to KTYM's performance was raised apart from the Cotten programs. The Commission determined that as to a specific attack by Cotten on Arnold Forster, General Counsel of the League, KTYM had violated the "fairness doctrine" because the station had failed to give advance notice of the facts to Forster or the League. However, the Commission concluded that this was an isolated violation which neither afforded a basis for denying the license renewal nor necessitated an evidentiary hearing since the station had offered free time for a reply. That offer was still outstanding when the Commission acted.
 
 
 4
 The Commission considered the broad issue raised by the League that Cotten's utterances were so contrary to the public interest that a Licensee carrying such programs should be disqualified for renewal. The Commission declared that its historic policy in conformity with Congressional authority precluded censorship of programs.
 
 
 5
 The Commission has long held that its function is not to judge the merit, wisdom or accuracy of any broadcast discussion or commentary but to insure that all viewpoints are given fair and equal opportunity for expression and that controverted allegations are balanced by the presentation of opposing viewpoints. Any other position would stifle discussion and destroy broadcasting as a medium of free speech. To require every licensee to defend his decision to present any controversial program that has been complained of in a license renewal hearing would cause most — if not all — licensees to refuse to broadcast any program that was potentially controversial or offensive to any substantial group. More often that [sic] not this would operate to deprive the public of the opportunity to hear unpopular or unorthodox views.
 
 
 6
 Joint Appendix 69.
 
 
 7
 The Commission went on to find that "an overall review of the stations operation" showed that renewal of the license would be in the public interest. In addition to affirming the need for KTYM's tender of free time to Appellants the Commission reprimanded the station for failure to give advance notice to the League as to the broadcast which included a personal attack on League officials.
 
 
 8
 Appellant's primary argument is that "recurrent bigoted appeals to anti-Semitic prejudice" and tolerance of personal attacks without notice to those attacked, constituted a basis for denial of license renewal and required an evidentiary hearing on those issues.
 
 
 9
 The Commission's position is that Congress does not permit a broadcaster to censor broadcasts involving attacks on persons or groups but that the fairness doctrine requires the Licensee to afford free time for response. The Commission opinion pointed to the long standing policy to encourage open discussion of all points of view, valid or otherwise, and noted that serious First Amendment questions would be raised by any policy inhibiting "robust debate."
 
 
 10
 The Commission relies also on procedural regularity as a basis for not conducting an evidentiary hearing, contending that all factual issues raised by Appellants were fully explored and that there was no dispute as to the facts which would be the subject of such a hearing.
 
 
 11
 Our examination of the record satisfies us that the Commission acted within its authority in denying an evidentiary hearing as to the undisputed facts which formed the basis of Appellant's claims. The disposition of Appellant's claims turned not on determination of facts but inferences to be drawn from facts already known and the legal conclusions to be derived from those facts.
 
 
 12
 The First Amendment aspect also deserves some comment. The Supreme Court has not defined the scope of First Amendment application to broadcasting but has intimated in dicta that it applies to licensed media.
 
 
 13
 We have no doubt that moving pictures, like newspapers and radio, are included in the press whose freedom is guaranteed by the First Amendment.
 
 
 14
 United States v. Paramount Pictures, 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260 (1948). In Farmers E. & C. Union, etc. v. WDAY, 360 U.S. 525, 527, 529-530, 79 S.Ct. 1302, 1304, 1305, 3 L.Ed.2d 1407 (1959), the Supreme Court noted that Congress had withheld from the Commission any power to censor broadcasts.
 
 
 15
 The term censorship, however, as commonly understood connotes any examination of thought or expression in order to prevent publication of "objectionable" material. * * * Thus, expressly applying this country's tradition of free expression to the field of radio broadcasting, Congress has from the first emphatically forbidden the Commission to exercise any censorship over radio communication.
 
 
 16
 See also American Communications Ass'n v. Douds, 339 U.S. 382, 396, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); West Virginia State Bd. of Ed. v. Barnette, 319 U.S. 624, 641, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).
 
 
 17
 Commissioner Loevinger, while concurring fully with the decision of the Commission, restated some basic propositions which seem to us unanswerable:
 
 
 18
 For the FCC to promulgate rules regarding permissible and impermissible speech relating to religion would be not only an egregious interference with free speech in broadcasting, but also an unconstitutional infraction of the free exercise clause and the establishment clause of the First Amendment.
 
 
 19
 * * * * * *
 
 
 20
 It is not only impractical — and impossible in any ultimate sense — to separate an appeal to prejudice from an appeal to reason in this field, it is equally beyond the power or ability of authority to say what is religious or racial. There are centuries of bloody strife to prove that man cannot agree on what is or is not "religion."
 
 
 21
 * * * * * *
 
 
 22
 Nevertheless these subjects will and must be discussed. But they cannot be freely discussed if there is to be an official ban on the utterance of "falsehood" or an "appeal to prejudice" as officially defined. All that the government can properly do, consistently with the right of free speech, is to demand that the opportunity be kept open for the presentation of all viewpoints. Yet this would be impossible under the rule espoused by the ADL. The present case illustrates the matter. The assailed commentator here does not ostensibly attack the Jews as a religious group, but does attack Zionists and the ADL because the latter is conducting a campaign against "right wing extremists," which is said to include that commentator. But if anyone is permitted to express views favorable to Zionism or the ADL, or unfavorable to "right wing extremists" or the assailed commentator, then the Fairness Doctrine requires that someone representing the contrary viewpoints be given the opportunity to reply. This, of course, is precisely what the ADL contends cannot be permitted. If what the ADL calls "appeals to racial or religious prejudice" is to be classed with hard-core obscenity, then it has no right to be heard on the air, and the only views which are entitled to be broadcast on matters of concern to the ADL are those which the ADL holds or finds acceptable. This is irreconcilable with either the Fairness Doctrine or the right of free speech.
 
 
 23
 Talk of "responsibility" of a broadcaster in this connection is simply a euphemism for self-censorship. It is an attempt to shift the onus of action against speech from the Commission to the broadcaster, but it seeks the same result — suppression of certain views and arguments. Since the imposition of the duty of such "responsibility" involves Commission compulsion to perform the function of selection and exclusion and Commission supervision of the manner in which that function is performed, the Commission still retains the ultimate power to determine what is and what is not permitted on the air. So this formulation does not advance the argument either constitutionally, ideologically or practically. Attempts to impose such schemes of self-censorship have been found as unconstitutional as more direct censorship efforts by government. Smith v. [People of State of] California, 361 U.S. 147 [80 S.Ct. 215, 4 L.Ed.2d 205] (1959); Bantam Books v. Sullivan, 372 U.S. 58 [83 S.Ct. 631, 9 L.Ed.2d 584] (1963); Washington Post v. Keogh, 125 U.S.App.D.C. 32, 365 F. 2d 965 (1966), cert. denied, 385 U.S. 1011 [87 S.Ct. 708, 17 L.Ed.2d 548] (1967).
 
 
 24
 Joint Appendix 143-145.
 
 
 25
 While the Commission has the power and indeed the duty to consider a pattern of libelous conduct in a license renewal hearing, the First Amendment demands that it proceed cautiously and Congress, as we have noted, limited the Commission's powers in this area. We hold that the record reflects substantial evidence in support of the Commission's decision.
 
 
 26
 Affirmed.
 
 
 27
 J. SKELLY WRIGHT, Circuit Judge, concurring:
 
 
 28
 Subject to the following observations, I join the court's opinion in this case.
 
 
 29
 The Anti-Defamation League charges that Station KTYM, knowingly and on repeated occasions, allowed to be broadcast a series of programs containing false and defamatory statements about Jews in general, and on one occasion about some Jewish individuals in particular.[1] Two types of program content are thus challenged — libeling an individual and attacking a group — and different approaches are required for each.
 
 
 30
 With respect to individual libel, I start with the premise that a license to run a radio station is not a license to libel. False defamatory statements, made knowingly or with reckless disregard of their falsity, cannot claim the shelter of the First Amendment. New York Times Co. v. Sullivan, 376 U.S. 254, 279-280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). A radio station, like a newspaper, cannot claim immunity from libel laws.[2]
 
 
 31
 Thus when a station allows a series of programs in which individuals are repeatedly defamed and the station is put on notice (for example, by the complaint of an offended individual) that such programs contain false and unsubstantiated statements, in a renewal proceeding involving that station's license the Commission should: (1) determine whether the station knew of the falsity of the material or allowed it to be broadcast in reckless disregard of its truth or falsity (the standard of New York Times Co. v. Sullivan), and (2) consider whether such programming is in the public interest. Neither the First Amendment nor a policy of encouraging stimulating and constructive radio broadcasting would preclude the Commission from refusing to renew a license because of repeated individual libels; nor would the Commission be prevented from cancelling the license of a broadcaster who persisted in such a course of programming.[3] In the instant case there is no pattern of repeated individual libels. Therefore I concur in affirming the Commission.
 
 
 32
 Attacking a group presents a harder problem. Under the law of libel, defamation of a broad group or class is not usually actionable.[4] And this kind of speech, detestable as some of its anti-Semitic and racist aspects may be, approaches the area of political and social commentary. To this extent it makes a stronger claim for First Amendment protection.[5] I share the desire of the Commission and the court to foster free and full debate on political and social issues. For this reason, broadcasters should not be so burdened in this area that they would shy away from presenting controversial issues.
 
 
 33
 Station KTYM offered the Anti-Defamation League substantial time to reply to the anti-Semitic broadcasts. This application of the "fairness doctrine" will have to suffice. To go further, requiring stations to check the truth of all commentary attacking a group or class, might result in a "chilling effect," constraining stations to steer clear of controversial material. However, as this case illustrates, there is a substantial flaw in the theory of the fairness doctrine. Not surprisingly, the Anti-Defamation League refused to dignify or exacerbate the attack by replying. It is likely that other groups would similarly refuse to reply. Under such circumstances, the Commission may decide to require a licensee to seek with reasonable diligence exponents of other views when it presents one side of a controversial issue in which a group or class is attacked.[6]
 
 
 34
 The requirements I would place on broadcasters, and the Commission, in dealing with material libeling an individual or attacking a group, are consistent with the Commission's overall policy of broadcaster responsibility. For example, in the context of protecting the public from rigged quiz shows, the Commission, in its report on Program Policy, 20 PIKE & FISCHER R.R. 1901, 1904 (1960), stated:
 
 
 35
 "* * * [T]he Commission had made its position clear that, in fulfilling its obligation to operate in the public interest, a broadcast station is expected to exercise reasonable care and prudence with respect to its broadcast material in order to assure that no matter is broadcast which will deceive or mislead the public. * *"
 
 
 36
 And in a major statement on the fairness doctrine, Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 FED.REG. 10415, 10421 (1964), the Commission stated:
 
 
 37
 "* * * Under fundamental communications policy, the licensee, with the exception of appearances of political candidates subject to the equal opportunities requirement of Section 315, is fully responsible for all matter which is broadcast over his station. It follows that when a program contains a personal attack, the licensee must be fully aware of the contents of the program, whatever its source or his actual involvement in the broadcast. * * *" (Emphasis added.)
 
 
 38
 Thus it is clear to me that the Commission is not helpless to act in this area.
 
 
 
 Notes:
 
 
 [1]
 The Commission concluded that "the Cotten broadcast of October 7, 1964, contained a personal attack on the ADL and its General Counsel, Mr. Forster. The other broadcasts referred to did not contain personal attacks on ADL or its officials, but did contain statements that can be regarded as anti-Semitic * * *."
 
 
 [2]
 In Gariepy v. Pearson, 92 U.S.App.D.C. 337, 207 F.2d 15, cert. denied, 346 U.S. 909, 74 S.Ct. 241, 98 L.Ed. 407 (1953), the court allowed the issue of libel to go to a jury. There both Drew Pearson and a radio station were sued for libel for a broadcast by Pearson over the station. The court noted that the station "examined the script in advance and admits it `caused' the words set forth in appellant's complaint to be broadcast." 92 U.S.App.D.C. at 338, 207 F.2d at 16. The same is true in the present caseSee also Gearhart v. WSAZ, Inc., E.D. Ky., 150 F.Supp. 98 (1957), affirmed, 6 Cir., 254 F.2d 242 (1958) (radio station sued for libel for one of its newscasts); cf. Lesesne v. Willingham, E.D. S.C., 83 F.Supp. 918 (1949) (Western Union liable for transmission of telegram where it knew it was libelous); see cases collected in Remmers, Recent Legislative Trends in Defamation by Radio, 64 HARV.L.REV. 727 (1951). Even the National Association of Broadcasters, in promulgating a model radio defamation statute, allowed suits for libel where the radio station "has failed to exercise due care to prevent the publication or utterance of such statement in such broadcast." Remmers, supra at 741.
 There is one narrowly drawn exception: a radio station is not responsible for libelous statements made in a political broadcast by a candidate for public office. Farmers E. & C. Union, etc. v. WDAY, 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959). This is so because § 315(a) of the Federal Communications Act precludes a station from deleting any of the material from such a speech. The station here, however, is under no such disability, as the Commission in brief agrees:
 "* * * The evidence before the Commission further showed that KTYM recognized its right to accept or reject programming material * * * and expressly provides in its contracts for the right to accept or reject programs in each separate case. * * *"
 "KTYM filed pleadings * * * setting forth new details such as its manner of screening the Cotten and other broadcasts to remove matter `which is adjudged unduly harsh and unnecessary' * * *."
 Brief for appellee, pp. 36, 9.
 
 
 [3]
 This would not be prohibited "censorship," 47 U.S.C. § 315 (1964), any more than would the Commission's considering on a license renewal application whether a broadcaster allowed "coarse, vulgar, suggestive, double-meaning" programming; programs containing such material are grounds for denial of a license renewal. Palmetto Broadcasting Co., 23 PIKE & FISCHER R.R. 483, 484 (1962), affirmed, 118 U.S.App.D.C. 144, 334 F. 2d 534, cert. denied, 379 U.S. 843, 85 S. St. 84, 13 L.Ed.2d 49 (1964)
 
 
 [4]
 See 33 AM.JUR. Libel and Slander § 192 (1941).
 
 
 [5]
 In Beauharnais v. People of State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), a divided Supreme Court upheld a conviction under a statute outlawing defamation of a racial or religious group. However, far from spawning progeny,Beauharnais has been left more and more barren by subsequent First Amendment decisions, to the point where it is now doubtful that the decision still represents the views of the Court.
 
 
 [6]
 Nothing I have said would preclude the Commission from finding that a station was not in the public interest whose regular programming consisted solely of views slanted toward one side of a controversial issue or issues, even if the station allowed the other side time to reply. The Commission could conclude that a station which offered more rounded programming better served the public