**YALE BROADCASTING COM-
PANY et al., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of Amer-
ica, Respondents.**

**No. 71–1780.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 24, 1972.

Decided Jan. 5, 1973.

Mr. Tracy A. Westen, Washington, D. C., with whom Mr. Eric H. Smith, Washington, D. C., was on the brief, for petitioners.

Mr. Joseph A. Marino, Associate Gen. Counsel, F. C. C., with whom Messers. John W. Pettit, Gen. Counsel, R. Michael Senkowski, Counsel, F. C. C., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for respondents. Mr. John H. Conlin, Associate Gen. Counsel, F. C. C. at the time the record was filed, also entered an appearance for respondent, F. C. C.

Before DANAHER, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

**WILKEY, Circuit Judge:**

The source of this controversy is a Notice issued by the Federal Communications Commission regarding "drug oriented" music allegedly played by some radio stations.[1] This Notice and a subsequent Order, the stated purposes of which were to remind broadcasters of a pre-existing duty, required licensees to have knowledge of the content of their programming and on the basis of this knowledge to evaluate the desirability of broadcasting music dealing with drug use. Appellant, a radio station licensee, argues first that the Notice and the Order are an unconstitutional infringement of its First Amendment right to free speech. In the alternative, appellant contends that they impose new duties on licensees and must, therefore, be the subject of rulemaking procedures. Finally it is argued that the statements' requirements are impermissibly vague and that the FCC has abused its discretion in refusing to clarify its position. Finding none of these arguments of the licensee valid, we affirm the action of the FCC.

### I. Substance of the First and Second Notices

In the late 1960's and early 1970's the FCC began receiving complaints from the public regarding alleged "drug oriented" songs played by certain radio broadcasters. In response to these complaints the Commission issued a Notice, the stated purpose of which was to remind broadcasters of their duty to broadcast in the public interest.[2] To fulfill this obligation licensees were told that they must make "reasonable efforts" to determine before broadcast the meaning of music containing drug oriented lyrics. The Notice specified that this knowledge must be in the possession of a management level executive of the

---

1. There are actually two major Federal Communications Commission actions involved in this dispute. The first is a Public Notice, 28 F.C.C.2d 409 (1971). The second is a Memorandum Opinion and

Order, 31 F.C.C.2d 377 (1971). The sole purpose of the second item mentioned above was to clarify and modify the Public Notice.

2. Public Notice, 28 F.C.C.2d 409 (1971).

station, who must then make a judgment regarding the wisdom of playing music containing references to drugs or the drug culture.

This initial Notice led to substantial confusion within the broadcast industry and among the public. Confusion centered around the meaning of phrases such as "knowing the content of the lyrics," "ascertain before broadcast," and "reasonable efforts."

In order to clarify these ambiguities, the FCC issued a second Memorandum and Order clarifying and modifying certain parts of the original Notice.[3] The thrust of this Order was that (1) the Commission was not prohibiting the playing of "drug oriented" records, (2) no reprisals would be taken against stations that played "drug oriented" music, but (3) it was still necessary for a station to "know" the content of records played and make a "judgment" regarding the wisdom of playing such records.

## II. *Interpretation of the Definitive Order*

Many of appellant's fears and arguments stem from the apparent inconsistencies between the Notice and the subsequent Order. It is quite clear, however, that the Order "constitutes the Commis-

sion's definitive statement" regarding broadcaster responsibility.[4] To the extent that the two are inconsistent or confused, we treat the Notice, as we believe the Commission intends, as superseded by the Order. Reference to the Commission's requirements is to those established by the Order.

Once the Order is taken as definitive, it becomes fairly simple to understand what the FCC asks of its licensees. The Order recognizes the gravity of the drug abuse problem in our society. From this basis, the Order proceeds to remind broadcasters that they may not remain indifferent to this severe problem and must consider the impact that drug oriented music may have on the audience.[5]

The Commission then makes the common sense observation that in order to make this considered judgment a broadcaster must "know" what it is broadcasting.[6]

The Commission went to great lengths to illustrate what it meant by saying that a broadcaster must "know" what is being broadcast. The Order emphasizes that it is not requiring the unreasonable and that the Commission was "not calling for an extensive investigation of each . . . record"[7] that dealt with drugs. It also made clear that there

3. Memorandum Opinion and Order, 31 F.C.C.2d 377 (1971).

4. In its Memorandum and Order, the FCC noted that its initial Notice had been widely misconstrued. The Commission then said:
 [I]t follows that where a notice is so erroneously depicted, we should appropriately call attention to the error. We do so in this Memorandum and Order. While it adheres fully to the above noted established policy of licensee responsibility, this opinion treats the matter in greater detail and this constitutes the Commission's definitive statement in this respect.
 31 F.C.C.2d at 378.

5. "Clearly, in a time when there is an epidemic of illegal drug use—when thousands of young lives are being destroyed by use of drugs like heroin, methedrin ("speed"), cocaine—the licensee

should not be indifferent to the question of whether his facilities are being used to promote the illegal use of harmful drugs." *Ibid.*

6. "The Commission did make clear in the Notice that the broadcaster could jeopardize his license by failing to exercise license responsibility in this area. Except as to broadcasts by political candidates, the licensee is responsible for the material broadcast over his facilities. . . . The thrust of the Notice is simply that this concept of licensee responsibility extends to the question of records which may promote or glorify the use of illegal drugs. The licensee should know whether his facilities are being used to present again and again a record which urges youth to take heroin or cocaine— that it is a wonderful, joyous experience." *Id.* at 379.

7. *Id.* at 380.

was no general requirement to pre-screen records.[8]

The Commission in its Order was obviously not asking broadcasters to decipher every syllable, settle every ambiguity, or satisfy every conceivable objection prior to airing a composition. A broadcaster must know what he can reasonably be expected to know [9] in light of the nature of the music being broadcast. It may, for example, be quite simple for a broadcaster to determine that an instrumental piece has little relevance to drugs. Conversely, it may be extremely difficult to determine what thought, if any, some popular lyrics are attempting to convey. In either case, only what can reasonably be understood is demanded of the broadcaster.

Despite all its attempts to assuage broadcasters' fears, the Commission realized that if an Order can be misunderstood, it will be misunderstood—at least by some licensees. To remove any excuse for misunderstanding, the Commission specified examples of how a broadcaster could obtain the requisite knowledge. A licensee could fulfill its obligation through (1) pre-screening by a responsible station employee, (2) monitoring selections while they were being played, or (3) considering and responding to complaints made by members of the public.[10] The Order made clear that these procedures were merely suggestions, and were not to be regarded as either absolute requirements or the exclusive means for fulfilling a station's public interest obligation.[11]

Having made clear our understanding of what the Commission has done, we now take up appellant's arguments seriatim.

### III. *An Unconstitutional Burden on Freedom of Speech*

■ Appellant's first argument is that the Commission's action imposes an unconstitutional burden on a broadcaster's freedom of speech. This contention rests primarily on the Supreme Court's opinion in Smith v. California,[12] in

---

8. As noted below, the Commission made reference to methods of compliance other than pre-screening in the Memorandum and Order. In a subsequent Order the Commission explicitly disclaimed any intention of requiring pre-screening:

> We think it appropriate to point out, however, that petitioners' repeated reference to a pre-screening requirement for each record is an erroneous interpretation of our April 16, 1971 order.

Memorandum Opinion and Order, 31 F.C.C.2d 385, 386 n. 1 (1971).

9. "We recognized in the ADL case, *supra,* that imposition of any undue verification process 'could significantly inhibit the presentation of controversial issue programming' (6 F.C.C.2d at p. 386); cf. Washington Post v. Keogh, 125 U.S. App.D.C. 32, 365 F.2d 965 (1966). That is equally so here. Therefore, what is required is simply reasonable and good faith attention to the problem. We would conclude this aspect as we did in the prior Notice.

> Thus, here as in so many other areas, it is a question of responsible, good faith action by the public trustee to whom the frequency has been licensed. No more, but certainly no less is called for."

31 F.C.C.2d 377, 380.

10. "Again, it may be desirable to proceed by analogy. Licensees instruct their employees that before presenting taped material containing questionable language (i. e., of an indecent or obscene nature), the matter should be brought to the attention of a responsible management official. . . . Further, while such material might be presented once in a series part of which has been screened and approved, its presentation is then picked up, either by complaint or station personnel, and a judgment made as to further presentation. So also here, disc jockeys could be instructed that where there is a question as to whether a record promotes the illegal drug usage, a responsible management official should be notified so he can exercise his judgment. It may be that a record which raises an issue in this respect is played once, but then the station personnel who have heard it will be in a position to bring it to the attention of the appropriate management official for his judgment." *Ibid.*

11. *See* note 9, *supra.*

12. 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

which a bookseller was convicted of possessing and selling obscene literature. The Supreme Court reversed the conviction. Although the State had a legitimate purpose in seeking to ban the distribution of obscene materials, it could not accomplish this goal by placing on the bookseller the procedural burden of examining every book in his store. To make a bookseller criminally liable for all the books sold would necessarily "tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature . . . ." [13]

Appellant compares its own situation to that of the bookseller in *Smith* and argues that the Order imposes an unconstitutional burden on a broadcaster's freedom of speech. The two situations are easily distinguishable.

Most obviously, a radio station can only broadcast for a finite period of twenty-four hours each day; at any one time a bookstore may contain thousands of hours' worth of readable material. Even if the Commission had ordered that stations pre-screen all materials broadcast, the burden would not be nearly so great as the burden imposed on the bookseller in *Smith*. As it is, broadcasters are not even required to pre-screen their maximum of twenty-four hours of daily programming. Broadcasters have specifically been told that they may gain "knowledge" of what they broadcast in other ways.[14]

A more subtle but no less compelling answer to appellant's argument rests upon *why* knowledge of drug oriented music is required by the Commission. In *Smith*, knowledge was imputed to the purveyor in order that a criminal sanction might be imposed and the dissemination halted. Here the goal is to assure the broadcaster has adequate knowledge. Knowledge is required in order that the broadcaster can make a judgment about the wisdom of its programming. It is beyond dispute that the Commission requires stations to broadcast in the public interest. In order for a broadcaster to determine whether it is acting in the public interest, knowledge of its own programming is required. The Order issued by the Commission has merely reminded the industry of this fundamental metaphysical observation—in order to make a judgment about the value of programming one must have knowledge of that programming.

We say that the licensee must have *knowledge* of what it is broadcasting; the precise *understanding* which may be required of the licensee is only that which is reasonable. No radio licensee faces any realistic possibility of a penalty for misinterpreting the lyrics it has chosen or permitted to be broadcast. If the lyrics are completely obscure, the station is not put on notice that it is in fact broadcasting material which would encourage drug abuse. If the lyrics are meaningless, incoherent, the same conclusion follows. The argument of the appellant licensee, that so many of these lyrics are obscure and ambiguous, really is a circumstance available to some degree in his defense for permitting their broadcast, at least until their meaning is clarified. Some lyrics or sounds are virtually unintelligible. To the extent they are completely meaningless gibberish and approach the equivalent of machinery operating or the din of traffic, they, of course, do not communicate with respect to drugs or anything else, and are not within the ambit of the Commission's order. Speech is an expression of

---

13. *Id.* at 153–154, 80 S.Ct. at 218.

14. *See* footnote 10, *supra,* and accompanying text. Appellant attempts to buttress its argument based on *Smith* by pointing to a number of cases that reject the contention that purveyors of public information are required to verify the truth of controversial statements. *See* Appellant's Brief at 41–42. Those cases are even less relevant than *Smith*. They all involve fact situations in which obtaining the needed information would be most difficult or even impossible.

sound or visual symbols which is intelligible to some other human beings. At some point along the scale of human intelligibility the sounds produced may slide over from characteristics of free speech, which should be protected, to those of noise pollution, which the Commission has ample authority to abate.[15]

We not only think appellant's argument invalid, we express our astonishment that the licensee would argue that before the broadcast it has no knowledge, and cannot be required to have any knowledge, of material it puts out over the airwaves. (We can understand that the individual radio licensees would not be expected to know in advance the content or the quality of a network program, or a free flowing panel discussion of public issues, or other audience participation program, and certainly not a political broadcast. But with reference to the broadcast of that which is frequently termed "canned music," we think the Commission may require that the purveyors of this to the public make a reasonable effort to know what is in the "can." No producer of pork and beans is allowed to put out on a grocery shelf a can without knowing what is in it and standing back of both its content and quality. The Commission is not required to allow radio licensees, being freely granted the use of limited air channels, to spew out to the listening public canned music, whose content and quality before broadcast is totally unknown.

Supposedly a radio licensee is performing a public service—that is the raison d'etre of the license. If the licensee does not have specific knowledge of what it is broadcasting, how can it claim to be operating in the public interest? Far from constituting any threat to freedom of speech of the licensee, we

conclude that for the Commission to have been less insistent on licensees discharging their obligations would have verged on an evasion of the Commission's own responsibilities.

By the expression of the above views we have no desire whatsoever to express a value judgment on different types of music, poetry, sound, instrumentation, etc., which may appeal to different classes of our most diverse public. "De gustibus non est disputandum." But what we are saying is that whatever the style, whatever the expression put out over the air by the radio station, for the licensee to claim that it has no responsibility to evaluate its product is for the radio station to abnegate completely what we had always considered its responsibility as a licensee. All in ,all, and quite unintentionally, the appellant-licensee in its free speech argument here has told us a great deal about quality in this particular medium of our culture.

## IV. *The Requirement of Rulemaking*

 We turn next to appellant's contention that the Commission in its Order has imposed a new duty on the broadcasting industry. If the FCC were indeed imposing a new duty on its licensees, its action should be subject to the public debate and scrutiny of rulemaking proceedings.[16] If the Commission is simply reminding broadcasters of an already existing duty, rulemaking is not required. We conclude that the stated purpose and the actual result of the Commission's Notice and Order was to remind the industry of a pre-existing duty.

The basis for this pre-existing duty has existed since the early days of government regulation of the airways.[17] The most thorough articulation of this duty was given in the Commission's

15. *Cf.* Noise Control Act of 1972, Pub.L. No. 92–574, 86 Stat. 1234 (1972).

16. Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 35, 447 F.2d 1201, 1204 n. 5 (1971).

17. *See, e. g.*, KFKB Broadcast Association v. Federal Radio Commission, 60 U.S.App. D.C. 79, 81, 47 F.2d 670, 672 (1931).

1960 Program Policy Statement wherein it said:

> Broadcast licensees must assume responsibility for all material which is broadcast through their facilities. This includes all programs and advertising material which they present to the public. . . . This duty is personal to the licensee and may not be delegated. He is obligated to bring his positive responsibility affirmatively to bear upon all who have a hand in providing broadcast material for transmission through his facilities so as to assure the discharge of his duty to provide acceptable program schedule consonant with operating in the public interest in his community.[18]

This 1960 Statement and the Order challenged here are remarkably similar. Both require the broadcaster to assume responsibility for what is broadcast, that the broadcaster actively exercise his judgment in pursuit of this responsibility, and that this exercise of judgment result in programming that is in the public interest. The only real difference between the 1960 Statement and the Order under attack is that the Order (1) deals with programming as it relates to drugs rather than programming generally, and (2) specifically states that a broadcaster must have "knowledge" of what he is programming.

There is a long-standing Commission policy of reminding licensees of their responsibility in a particular area whenever there appears to be licensee indifference. A notice quite similar to the one challenged here was issued with respect to foreign language broadcasting.[19]

There, a Commission inquiry had revealed that many licensees were carrying foreign language broadcasts without having any familiarity with the foreign language. Broadcasters were accordingly advised:

> Licensee responsibility requires that internal procedures be established and maintained to insure sufficient familiarity with the foreign language to know what is being broadcast and whether it conforms to the station's policies and to the requirements of the Commission's rules. Failure of licensees to establish and maintain such control over foreign language programming will raise serious questions as to whether the station's operation serves the public interest.[20]

In addition to this example, the Commission has reminded broadcasters of their obligations in a number of other specific situations.[21]

It is entirely reasonable for the Commission to issue "reminders" referring to specific areas when such problems exist. The Commission need not content itself with repeating general policy statements when the general policy is being violated in a very specific way. It is much more logical for the Commission to point out the specific problem and then illustrate how the general policy applies in the particular situation.

It is likewise irrelevant that the current Order requires broadcasters to "know" what they are programming. Such a requirement imposes no new burden upon the broadcasting industry. Indeed, the requirement that the licensees broadcast in the public interest necessi-

---

18. Report and Statement of Policy re: Commission En Banc Programming Inquiry, 25 Fed.Reg. 7291, 7295, 30 R.R. 1902, 1912–1913 (1960).

19. Public Notice Concerning Foreign Language Programs, 9 P. & F. Radio Regs. 2d 1901 (1967).

20. *Ibid.*

21. *See, e. g.*, Licensee Responsibility With Respect to the Broadcast of False, Misleading or Deceptive Advertising, FCC 61–1316 (November 7, 1961).

Appellant, in its reply brief, attempts to distinguish these examples by pointing out that they deal with unique facts and are based upon different legal theories than those involved in this case. This is true. We make use of these examples here, however, for the very limited purpose of illustrating that the Commission often draws attention to and makes statements regarding specific areas of licensee activity.

tates some sort of knowledge on their part. Undoubtedly, the only reason the Commission stressed the point in the Order was because of certain broadcasters' absurd contention that they either did not or could not know what they were broadcasting. As we noted in Part III, it cannot be argued that no knowledge has ever been required of broadcasters.

In its less extreme form appellant's contention seems to be that, although some form of knowledge has always been required, the Notice and Order impose a much greater burden of knowledge on the broadcasting industry than has previously existed. This argument is baseless. The requisite degree of knowledge is not absolute but, rather, is quite liberal. Indeed, a licensee could not do less than is asked and still fulfill its obligation to broadcast in the public interest. In sum, the main thrust of the Commission's earlier Notice and of its later Order is that whether a song presents the banal observations of a moon-struck adolescent, resembles two enraged alley cats fighting in a garbage can, or contains the subtle reflections of a master poet, a licensee may not broadcast ignorant of the content of his programming.[22]

## V. *Asserted Vagueness*

Perhaps the most strenuously urged and least meritorious of appellant's arguments are based upon the contention that the Commission's Order is impermissibly vague. From this common starting point, appellant argues (1) that the Order is unconstitutionally vague, or (2) that the Order is so vague that the Commission abused its discretion in refusing to clarify it.

### A.

■ It is indisputable that generally the Government may not draw a line between permissible and impermissible speech in such an unclear and imprecise manner that "men of common intelligence must necessarily guess at its meaning and differ as to its application."[23] We shall assume for the moment that this standard applies with full force to the broadcast industry. Even under this standard the Commission's Order is not unconstitutionally vague. In fact, the Commission has done an admirable job of explaining the nature and degree of knowledge expected of broadcasters. As illustrated in Part II of this opinion, this court has no difficulty understanding what the Commission expects of its licensees.

Removed from appellant's obfuscation, the structure, purpose and requirements of the Order are quite clear. First, the Order defines what it is attempting to achieve. Secondly, it provides three examples of ways a broadcaster *may* attain this goal. Thirdly, the Order does not forbid a broadcaster from attaining the goal by another means.[24] Thus the Order avoids the constitutional infirmity of vagueness by providing explicit ways for a broadcaster to meet its requirements while simultaneously avoiding overbreadth by not limiting compliance to the methods specified.

### B.

■ A second argument based on the alleged vagueness of the Order is that the Commission has abused its discretion in failing to clarify the nature of its requirements. Specifically, appel-

22. Appellant attempts to buttress its argument that the Order imposes a new duty by pointing to the widespread use of live and network programming. The argument is that since it is impossible to know prior to broadcast what is in those types of programs, the Notice must, if it requires any knowledge at all, impose a new duty. This argument ignores the fact that the Notice imposes no absolute requirement to pre-screen or know what a rec-

ord says prior to broadcast. *See* footnote 8, *supra.* Pre-screening is merely one way that a broadcaster may fulfill its obligation.

23. Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

24. *See generally* the discussion in Part II of the opinion.

lant charges that the Commission abused its discretion in declining to issue a declaratory judgment on the acceptability of its proposed plan for complying with the Notice.

It is clearly within the discretion of the Commission to issue a Declaratory Order on a licensee's proposal.[25] It is equally clear, however, that the Commission is not *required* to issue such a declaratory statement merely because a broadcaster asks for one.[26] There are over 7,500 radio stations in this country. If the Commission were required to pass upon, approve or disapprove, the methods of operations of each of these stations, the administrative task would be enormous. This disinclination to rule here is in accord with the Commission's long standing policy of refusing to issue interpretative rulings or advisory opinions whenever the critical facts are not explicitly stated or there is a possibility that subsequent events will alter them.[27]

An administrative agency should not be compelled to issue a clarifying statement unless its failure to do so can be shown to be a clear abuse of discretion. Here the Commission could reasonably conclude that it had said enough and that the rest was up to the "licensee's individual responsibility for programming."[28] We will not, therefore, compel the Commission to issue a ruling on appellant's proposed plan for compliance.

## VI. *Conclusion*

In spite of the horrendous forebodings which brought appellant into court the fact is that appellant has recently had its license renewed. Likewise, there has been no showing or suggestion that the standard enunciated in the Order has been employed to deny any license to a broadcaster. If such a denial does occur and can be shown to be unfair or due to a misapplication of the Commission's own guidelines (as described in Part II of our opinion), then redress may be sought in the courts. Until that time, appellant might commit its energies to the simple task of understanding what the Commission has already clearly said, rather than instituting more colorful but far less fruitful actions before already heavily burdened federal courts.

For the reasons given above, the action of the Federal Communications Commission is

Affirmed.

## ON MOTION FOR REHEARING EN BANC

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

PER CURIAM.

The motion for rehearing *en banc* initiated by a member of the Court in regular active service is denied, a majority of the Circuit Judges who are in regular active service not having voted

25. "The agency, with like effect as in the case of other orders, *and in its sound discretion,* may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e) (1970) (emphasis added).

26. "[I]n applying the public interest standard to programming, the Commission walks a tightrope between saying too much and saying too little. In most areas it has resolved this dilemma by imposing only general affirmative duties—e. g., to strike a balance between the various interests of the community, or to provide a reasonable amount of time for the presen-

tation of programs devoted to the discussion of public issues. . . . Given . . . [the Commission's] long-established authority to consider program content, this general approach probably minimizes the dangers of censorship or pervasive supervision." Banzhaf v. FCC, 132 U.S.App.D.C. 14, 27, 405 F.2d 1082, 1095 (1968).

27. *See, e. g.,* Use of Broadcast Facilities by Candidates for Public Office, 24 F.C.C. 2d 832, 885 (1970).

28. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 27, 405 F.2d 1082, 1095 (1968).

in favor of it (Rule 35, Federal Rules of Appellate Procedure).

Separate Statement by Chief Judge BAZELON as to why he would grant rehearing *en banc, sua sponte.*

BAZELON, Chief Judge:

This litigation concerns a series of directives issued by the Federal Communications Commission in 1971 which advised the nation's broadcasters that they were expected to exercise "responsibility" in regard to the playing of "drug-oriented" popular records.[1] The petitioners argued that the impact of the Commission's rulings was indirect censorship of these songs. The panel of this court which heard the case decided that the Commission's statements merely reiterated a traditional Commission policy—that broadcast licensees must "assume responsibility for all material which is broadcast through their facilities".[2] After reviewing the panel decision, I moved for rehearing of the case *en banc.*[3]

The panel opinion found that the language of the Commission's directives does not purport to censor popular songs. But that language can only be understood in the light of the Commission's course of conduct.

The Commission's initial statement in the area of "drug-oriented" songs was a "Public Notice" issued on March 5, 1971.[4] The Notice, entitled "Licensee Responsibility to Review Records Before Their Broadcast", did not specifically prohibit the playing of particular songs. But broadcasters might well have read it as a prohibition. For one thing, two members of the Commission, including the member reported to be the originator of the Notice,[5] appended to it a formal statement explaining that their goal was to "discourage, if not eliminate, the playing of records which tend to promote and/or glorify the use of illegal drugs."[6] Five weeks after the Notice was issued, the Commission's Bureau of Complaints and Compliance provided broadcasters the names of 22 songs which had come to its attention as "so-called drug-oriented song lyrics."[7]

The Commission's action was reported by responsible organs of the press as an act of censorship.[8] It appears that radio stations moved quickly to ban certain songs. In some cases stations stopped playing, regardless of subject or lyric, all the works of particular artists whose views might lift the Commission's eyebrow.[9] Broadcasters circulated the list of 22 songs throughout the industry as a "do not play" list.[10]

The Commission's subsequent "Memorandum Opinion and Order", issued on April 16, 1971,[11] and designated by the

---

1. As to the nature of the broadcasters' "responsibility", see pp. 603, 604, infra.

2. Yale Broadcasting Co. v. FCC, at 599, 600, quoting Report and Statement of Policy re: Commission En Banc Programming Inquiry, 25 Fed.Reg. 7291, 7295, 30 R.R. 1902, 1912–13 (1960).

3. Rule 35(a), Federal Rules of Appellate Procedure. This is—and should be—an unusual procedure. See, e. g., United States v. Sambro, 147 U.S.App.D.C. 75, 454 F.2d 918 (1971) (Statement of Chief Judge Bazelon); Southern Ry. Co. v. Lanham, 408 F.2d 348 (5th Cir. 1969) (dissent from denial of rehearing en banc).

4. 28 FCC 2d 409 (1971).

5. I. e., Cmr. Robert E. Lee; cf. Week's Profile, Broadcasting, May 3, 1971, p. 67.

6. 28 FCC 2d 410, 411 (1971).

7. In its subsequent Order, infra, the Commission reported that the 22 songs had been identified by the Department of the Army. Apparently the Commission conferred with military officials before issuing the initial Public Notice. 31 FCC 2d 79 (1971). The Commission did not consult with the Bureau of Narcotics and Dangerous Drugs. N.Y. Times, March 28, 1971, p. 41, c 1.

8. See, e. g., headlines quoted at 32 FCC 2d 377 (1971) and N.Y. Times, March 7, 1971, p. 28, c. 3.

9. Joint App. at 87–88; see Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S. App.D.C. 305, 473 F.2d 16, 77 (1972) (Chief Judge Bazelon dissenting) at 366 n. 60.

10. Joint App. at 148.

11. 32 FCC 2d 377 (1971).

Commission as its "definitive statement" on the subject, appeared to backtrack somewhat. The Order repudiated the list of 22 songs. It stated that the evaluation of which records to play "is one solely for the licensee", and that "[t]he Commission cannot make or review such individual licensee judgment."

But the Commission's order went further. Instead of rescinding the Public Notice, the Order restated its basic threat: "the broadcaster could jeopardize his license by failing to exercise licensee responsibility in this area." As we have recognized, "licensee responsibility" is a nebulous concept.[12] It could be taken to mean—as the panel opinion takes it—only that "a broadcaster must 'know' what it is broadcasting." On the other hand, in light of the earlier Notice, and in light of the renewed warnings in the Order about the dangers of "drug-oriented" popular songs, broadcasters might have concluded that "responsibility" meant "prohibition".

The Commissioners themselves were unclear on the matter. The Order expressed full adherence to the policy of the prior Notice. But two Commissioners issued concurring statements indicating that the Order restored the status quo prior to the March 5 Notice.[13] A third Commissioner issued a dissenting statement indicating that the Order did not restore the status quo.[14] A fourth Commissioner issued a rather enigmatic statement indicating his agreement with both the Notice and the Order but observing that they established an "impossible assignment."[15] The confusion was crystallized later in 1971 in Congressional testimony by FCC Chairman Burch. At one point, the Chairman offered this assurance:

> Chairman Burch: . . . [C]ontrary to Commissioner Johnson's statement that we banned drug lyrics, we did not ban drug lyrics. . . .

Moments later, however, the following ensued:

> Senator Nelson: All I am asking is: If somebody calls to the FCC's attention that a particular station is playing songs that, in fact, do promote the use of drugs in the unanimous judgment of the Commission; if you came to that conclusion, what would you do?

> Chairman Burch: I know what I would do, I probably would vote to take the license away.[16]

This court is the primary forum for judicial review of broadcast licensing regulation. In reviewing the Commission's actions in technical areas—e. g. policing broadcasters' mechanical operations and interference between stations—we must accord great deference to its decisions. But no such deference is due in cases involving the Commission's "public interest" regulation of program content. It is the "power to specify material which the public interest requires or forbids to be broadcast that carries the seeds of the general authority to censor. . . ."[17] Courts have a special responsibility to protect First

---

12. Anti-Defamation League of B'nai B'rith v. FCC, 131 U.S.App.D.C. 146, 403 F.2d 169 (1968).

13. 32 FCC 2d 382 (1971) (Cmrs. Bartley and H. Rex Lee).

14. Id. at 386. (Cmr. Johnson).

15. Id. at 382 (Cmr. Wells).

16. Hearings on the Effect of the Promotion and Advertising of Over-the-counter Drugs on Competition, Small Business, and Health and Welfare of the Public, Before the Subcomm. on Monopoly of the Senate Select Comm. on Small Business, 92d Cong., 1st Sess., pt. 2 at 734–736 (1971).

17. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 26, 405 F.2d 1082, 1094 (1968), cert. denied sub nom. Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed. 2d 93 (1969).
 But we emphasize that our cautious approval [in *Banzhaf*] does not license the Commission to scan the airwaves for offensive material with no more discriminating a lens than the "public interest" or even the "public health".
 132 U.S.App.D.C. at 31, 405 F.2d at 1099.

Amendment rights and a special expertise for doing so.[18]

In NAACP v. Button, Mr. Justice Brennan observed that "precision of regulation must be a touchstone" in the area of freedom of expression.[19] There is no precision here. The Commission's chameleon-like directives reflect the spectrum from confusion to deliberate obfuscation. The court must look to the impact of these directives, not merely their language.[20] Such review is all the more necessary where the Commission's directives are couched in code words for license renewal such as "public interest" or "licensee responsibility". Seven years ago, a member of the Commission explained:

> Talk of "responsibility" of a broadcaster in this connection is simply a euphemism for self-censorship. It is an attempt to shift the onus of action against speech from the Commission to the broadcaster, but it seeks the same result—suppression of certain views and arguments. Since the imposition of the duty of such "responsibility" involves Commission compulsion to perform the function of selection and exclusion and Commission supervision of the manner in which that function is performed, the Commission still retains the ultimate power to determine what is and what is not permitted on the air.[21]

Judge (now Chief Justice) Burger found this reasoning to be "unanswerable." Anti-Defamation League of B'nai B'rith v. FCC, 131 U.S.App.D.C. 146, 148, 403 F.2d 169, 171 (1968). In the differing circumstances of this case, that reasoning might be answerable. But the court cannot abdicate its responsibility to face the question.

The panel opinion indicates that the present challenges to the Commission's directives are premature; that the Commission's final sanction is denial of a license, and until that sanction is imposed, the petitioners cannot demonstrate any harm from the Commission's actions. Opposed to this viewpoint is the often recognized principle that the threat of legal sanction can have as much effect on the conduct of threatened parties as the sanction itself.[22] If that principle applies here, as petitioners argue, then there is a judicially cognizable in-

18. Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

19. 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).

20. See, e. g., Baird v. State Bar of Arizona, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Bagget v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 68, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); cf. Laird v. Tatum, 408 U.S. 1, 12–13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 32–33, 405 F.2d 1082, 1100–1101 (1968) cert. denied sub nom. Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed. 2d 93 (1969).

21. Complaint of Anti-Defamation League of B'nai B'rith Against Station KYTM, 6 FCC 2d 385, 398. (Cmr. Loevinger, concurring).

22. CBS v. FCC, 316 U.S. 407, 414, 62 S.Ct. 1194, 86 L.Ed. 1563 (1941); see Environmental Defense Fund v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1098–1100 (1970); cf. the candid statement of Clay T. Whitehead, Director of Telecommunications Policy in the White House, as to why the threat of license removal is an effective means of program control: "The main value of the sword of Damocles is that it hangs, not that it drops. Once you take a guy's license away, you no longer have any leverage against him." The Washington Post, March 9, 1973, at p. A 17 col. 3.

jury as soon as broadcasters begin to alter their programming to avoid governmental reprisal.

This case presents several other questions of considerable significance: Is the popular song a constitutionally protected form of speech?[23] Do the particular songs at which these directives were aimed have a demonstrable connection with illegal activities?[24] If so, is the proper remedy to "discourage or eliminate" the playing of such songs? Can the FCC assert regulatory authority over material that could not constitutionally be regulated in the printed media?[25]

Clearly, the impact of the Commission's order is ripe for judicial review. And, on that review, it would be well to heed Lord Devlin's recent warning:[26]

> If freedom of the press . . . [or freedom of speech] perishes, it will not be by sudden death. . . . It will be a long time dying from a debilitating disease caused by a series of erosive measures, each of which, if examined singly, would have a good deal to be said for it.

---

**23.** Popular songs might be considered mere entertainment, or even noise pollution. Yale Broadcasting Co. v. FCC, at 598, 599. On the other hand, historians and sociologists have noted that the popular song has been an important medium of political, moral, and aesthetic expression in American life. *Morison, Oxford History of the American People,* xxiii–xxvii, 223, 238, 250, 399, 479, 634, 860, 917 (1965) ; *Reich, The Greening of America,* 242–251 (1971).

**24.** The only evidence in the record on this point is the statement of the Director of The Bureau of Narcotics and Dangerous Drugs expressing strong doubt that there is any connection between "drug-oriented song lyrics" and the use of drugs. The New York Times, March 28, 1971, p. 41, c. 1. *See* Banzhaf v. FCC, 132 U.S. App.D.C. 14, 31–32, 405 F.2d 1082, 1098–1099 (1968), cert. den. sub nom. Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct.

50, 24 L.Ed.2d 93 (1969). *Cf.* California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1973) (Marshall, J., dissenting).

**25.** *See* Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16 (1972) (Chief Judge Bazelon, dissenting) (application of the Fairness Doctrine). Unlike the "Fairness Doctrine" cases, there can be no assertion here that the chilling effect is incidental to providing access to the media for viewpoints that would contribute to a fuller debate on public issues. The question is thus presented whether the rationale of the "Fairness Doctrine", or any other realities of the electronic media, warrant intrusion on broadcasters' free speech rights in this case.

**26.** Quoted in remarks by Richard S. Salant, to the Boston Univ. School of Public Broadcasting, Boston, Mass. April 28, 1971.