No. 72–1495. YALE BROADCASTING CO. ET AL. v. FEDERAL COMMUNICATIONS COMMISSION ET AL. C. A. D. C. Cir. Certiorari denied. MR. JUSTICE BRENNAN would grant certiorari and set case for oral argument.

MR. JUSTICE DOUGLAS, dissenting.

In March 1971, the FCC issued a public notice, Licensee Responsibility to Review Records Before Their Broadcast, 28 F. C. C. 2d 409, which was interpreted in many quarters as a prohibition on the playing of "drug related" songs by licensees.[1] That belief was strengthened five weeks later when the Commission's Bureau of Complaints and Compliance provided broadcasters with the names of 22 songs labeled "drug oriented" on the basis of their lyrics.[2] The industry widely viewed this as a list of banned songs, and many licensees quickly acted to remove other songs from the air as

---

[1] N. Y. Times, Mar. 7, 1971, p. 28, col. 3. In some cases stations stopped playing, regardless of subject or lyric, all the works of particular artists whose views might offend the Commission. 155 U. S. App. D. C. 390, 399 n. 9, 478 F. 2d 594, 603 n. 9 (1973) (Bazelon, C. J., dissenting) (citing petitioners' joint appendix, pp. 87–88).

[2] In its subsequent order in April the Commission reported that the list of 22 songs had been identified by the Department of the Army. 31 F. C. C. 2d 379 (1971). The Commission had not consulted with the Bureau of Narcotics and Dangerous Drugs. New York Times, Mar. 28, 1971, p. 41, col. 1 (reproduced in Joint Appendix in C. A. D. C. Cir., p. 203).

well. Some announcers were fired for playing suspect songs.

In April the Commission denied a petition for reconsideration, but attempted to "clarify" its previous order. 31 F. C. C. 2d 377. But although it repudiated the list of banned songs, it reiterated the basic threat by noting that "the broadcaster could jeopardize his license by failing to exercise licensee responsibility in this area." The nature of that responsibility was unclear. The new statement indicated reaffirmation of the prior decision, yet two concurring commissioners indicated that it restored the status quo to the March notice. It seems clear, however, that the Commission majority intended to coerce broadcasters into refusing to play songs that in the Commission's judgment were somehow "drug related." The April order suggested the prescreening of songs as one method of compliance. And in subsequent testimony before Congress, the Chairman of the Commission stated that if a licensee was playing songs that in the Commission's judgment "promote the use of hard drugs," "I know what I would do, I would probably vote to take the license away." [3]

Still unsure of its responsibilities, but desiring to avoid distorting its artistic judgments by superimposing the Commission's vague sociological ones, petitioner Yale Broadcasting Company drafted its own station policy and submitted it to the Commission, asking for a declaratory ruling on whether it complied with the Commission's orders. The station proposed to fulfill its duties in this area by public service and news pro-

---

[3] Hearings on the Effect of Promotion and Advertising of Over-the-counter Drugs on Competition, Small Business, and the Health and Welfare of the Public before the Subcommittee on Monopoly of the Senate Select Committee on Small Business, 92d Cong., 1st Sess., pt. 2, pp. 734–736 (1971).

gramming rather than by censoring its music. It elaborated its policy in a six-page statement. The Commission, finding the proposed policy too "abstract," declined to issue any declaratory ruling. The petitioners then brought this action, challenging the Commission's actions on First Amendment grounds, and arguing that the regulations were impermissibly vague. Petitioners also argued that they should have been the subject of formal rule-making procedures.

In *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 148 (1973) (concurring in judgment), I indicated my view that TV and radio stand in the same protected position under the First Amendment as do newspapers and magazines. I had not participated in the earlier opinion in *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969), which placed broadcasters under a different regime, authorizing governmental regulation to ensure "fairness" of presentation. I explained in *Columbia Broadcasting, supra,* the inevitable danger resulting from placing such powers in governmental hands—a danger appreciated by the Framers of the First Amendment. "The Fairness Doctrine has no place in our First Amendment regime. It puts the head of the camel inside the tent and enables administration after administration to toy with TV or radio in order to serve its sordid or its benevolent ends." 412 U. S., at 154. The instant case well illustrates those dangers.[4]

I doubt that anyone would seriously entertain the notion that consistent with the First Amendment the

---

[4] The rationale of *Red Lion, supra,* has now also been applied to newspapers by at least one State. See *Tornillo* v. *Miami Herald Publishing Co.,* 287 So. 2d 78 (Fla. 1973). While publishers and editors of newspapers would be surprised to learn that they were under a newly created federal bureau, such an event might not be unexpected, given the retrogressive steps that we have witnessed.

Government could force a newspaper out of business if its news stories betrayed too much sympathy with those arrested on marihuana charges, or because it published articles by drug advocates such as Timothy Leary. The proposition is so clear that rarely has the Government ever tried such a thing. See *Near* v. *Minnesota,* 283 U. S. 697 (1931). If the Government set up a new bureau with the job of reviewing newspaper stories for such "dangerous" tendencies, and with the power to put out of business those publications which failed to conform to the bureau's standards, the publisher would not have to wait until his newspaper had been destroyed to challenge the bureau's authority. The threat of governmental action alone would impose a prohibited restraint upon the press. "[I]nhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government." *Lamont* v. *Postmaster General,* 381 U. S. 301, 309 (1965) (BRENNAN, J., concurring). Cf. *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58 (1963); *Dombrowski* v. *Pfister,* 380 U. S. 479 (1965).

Yet this is precisely the course taken here by the FCC. The Commission imposes on the licensees a responsibility to analyze the meaning of each song's lyrics and make a judgment as to the social value of the message. The message may be clear or obscure, and careful scrutiny would seem required. This task is to be carried out under the Commission's watchful eye and with the knowledge that repeated errors will be punished by revocation of the license. For now the regulation is applied to song lyrics; next year it may apply to comedy programs, and the following year to news broadcasts.

In *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279 (1964), we said that the State could not impose on newspapers the burden, under penalty of civil liability, of checking out every controversial statement for

"truth." "Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 'steer far wider of the unlawful zone.' . . . The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments." *Ibid.* Songs play no less a role in public debate, whether they eulogize the John Brown of the abolitionist movement, or the Joe Hill of the union movement, provide a rallying cry such as "We Shall Overcome," or express in music the values of the youthful "counterculture." The Government cannot, consistent with the First Amendment, require a broadcaster to censor its music any more than it can require a newspaper to censor the stories of its reporters. Under our system the Government is not to decide what messages, spoken or in music, are of the proper "social value" to reach the people.

I dissent.

