NATIONAL ASSOCIATION OF INDE-PENDENT TELEVISION PRODUC-ERS AND DISTRIBUTORS et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-MISSION and The United States of America, Respondents,

American Broadcasting Companies, Inc., et al., Intervenors.

Nos. 847–851, Dockets 75–4021 and 75–4024 to 75–4026.

United States Court of Appeals, Second Circuit.

Argued March 7, 1975.

Decided April 21, 1975.

Katrina Renouf, Washington, D. C. (Margot Polivy and Edward J. Kuhlmann, Renouf, McKenna & Polivy, Washington, D. C., of counsel), for petitioner Nat. Association of Independent Television Producers and Distributors.

Stuart Robinowitz, New York City (Donald E. Brown, Moses Silverman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for petitioners Warner Brothers, Inc., Columbia Pictures Industries, Inc., MGM Television, United Artists Corporation, MCA, Inc., Twentieth Century-Fox Television.

Kenneth A. Cox, Washington, D. C. (William J. Byrnes, John Wells King, Ashbrook P. Bryant, Bethesda, Md., Haley, Bader & Potts, Washington, D. C., of counsel), for petitioner Sandy Frank Program Sales, Inc.

John D. Lane, Washington, D. C. (J. Carter McKaig, Ramsey L. Woodworth, Hedrick & Lane, Washington, D. C., of counsel), for petitioner Westinghouse Broadcasting Co., Inc.

Timothy B. Dyk, Washington, D. C. (J. Roger Wollenberg, Sally Katzen, Richard A. Allen, Wilmer, Cutler & Pickering, Washington, D. C., and Eleanor S. Applewhaite, New York City, of counsel), for petitioner and intervenor CBS, Inc.

Thomas N. Frohock, Washington, D. C. (James A. McKenna, Jr., McKenna, Wilkinson & Kittner, Washington, D. C., of counsel), for intervenor American Broadcasting Companies Inc.

Jerome J. Shestack, Philadelphia, Pa. (Bernard G. Segal, Peter S. Greenberg, Deena J. Schneider, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., and Corydon B. Dunham, New York City and Howard Monderer, Washington, D. C., of counsel), for intervenor Nat. Broadcasting Co., Inc.

Frank W. Lloyd, III, Washington, D. C. (Earle K. Moore, New York City, of counsel), for amici National Black Media Coalition, National Organization for Women, National Congress of Hispanic American Citizens, St. Louis Broadcast Coalition, Community Coalition for Media Change, Alabama Media Project and Alabama Civil Liberties Union, National Citizens Committee for Broadcasting, Office of Communication/United Church of Christ, American Civil Liberties Union, Puerto Rican Media Action and Educational Council, Oakland Media, San Francisco Committee on Children's Television, and Media Access Project.

Daniel M. Armstrong, Counsel, Federal Communications Commission (Ashton R. Hardy, Gen. Counsel, Joseph A. Marino, Asst. Gen. Counsel, Charles H. Bell, Jr., and Jack D. Smith, Jr., Counsel, Federal Communications Commission, of counsel), for respondent Federal Communications Commission.

Before FRIENDLY and GURFEIN, Circuit Judges, and BARTELS, District Judge.[*]

GURFEIN, Circuit Judge:

In 1970 the Federal Communications Commission adopted rules and regulations with respect to competition and responsibility in network television broadcasting. 47 C.F.R. §§ 73.658(j) and (k). These rules included rules concerning "prime time access," and "financial interest and syndication". The rules concerning "financial interest and syndication" are relevant, but are not in issue on this appeal.[1]

The Prime Time Access Rule, section 73.658(k) of the Commission's Rules, prohibits television stations in the 50 largest metropolitan areas from broadcasting *network* programs in more than three of the four evening hours, 7 P.M. to 11 P.M., in which most people watch television ("Prime Time") to allow the remaining hour ("Access Time") to be available for independently created programs.

The purpose of the Prime Time Access Rule was to free the affiliated stations from the dominance of the networks and to encourage diverse sources of programming and, incidentally, diversity of programming. The Prime Time Access Rule (PTAR I) permitted exceptions for certain network programs of uncontrollable duration, namely, "special news programs dealing with fast-breaking news events, on-the-spot coverage of news events, and political broadcasts by legally qualified candidates for public office."[2] The Commission pointed out that in view of the networks' common practice of offering only 3½ hours of

---

[*] Of the Eastern District of New York, sitting by designation.

1. Syndication is the licensing of television programs for broadcast to stations on a market-by-market basis. Network programs are programs which are fed into a network electronically and include also delayed broadcasts of programs originated by a network. Under the Syndication Rule, television networks are forbidden to "engage in the business commonly known as 'syndication'." The "financial inter-

est" rule prohibits any television network from acquiring any ancillary interest in a television program, such as an exclusive license to distribute the program in syndication.

2. The Commission also indicated it would consider waivers for live sports events that ran longer than expected, and for regularly scheduled network news broadcasts when preceded by an hour of local news broadcasts. 23 F.C.C.2d at 395, notes 35 and 36.

network programs to local network affiliates between 7 P.M. and 11 P.M., the new rule would open up one half hour of additional time per evening for non-network programs on affiliated stations.[3] To encourage access for independent sources, the Commission, after a time, also prohibited insertion of off-network programs[4] and feature films televised within the market in the past two years in place of the excluded network programs, for otherwise, as the Commission put it, "this would destroy the essential purpose of the rule to open the market to first run syndicated programs." Federal Communications Commission Report and Order May 4, 1970, 23 F.C.C.2d at 395, also in 35 Fed.Reg. 7417–26 (1970). The validity and constitutionality of PTAR I under the First Amendment were affirmed by this court in Mt. Mansfield Television, Inc. v. Federal Communications Commission, et al., 442 F.2d 470 (2 Cir. 1971).

The Commission re-examined the Prime Time Access Rule thereafter and issued a 1974 Report and Order (PTAR II) modifying the rule so as to eliminate access time on Sunday evenings and to reduce it to one half hour on other evenings with further exemptions for certain categories of programs within the six remaining half-hours. It also pegged access time to a particular time slot (7:30–8 P.M. in the Eastern and Pacific Time Zones, 6:30–7 P.M. in the Central and Mountain Zones). 44 F.C.C.2d 1081 (Feb. 6, 1974). The present petitioner challenged PTAR II. This court refused to review the Commission's order on the merits, but, instead, finding that the Commission had failed to allow adequate time for the amendments to become effective, enjoined the Commission from

making the amendments effective, before September 1975. National Association of Independent Television Producers and Distributors et al. (NAITPD) v. F.C.C., 502 F.2d 249 (2 Cir. 1974). The petitions were dismissed without prejudice to their renewal after the Commission had had an opportunity to conduct further proceedings. The court called the Commission's attention, in connection with further hearings it might hold, to certain policy issues raised by the petitions such as the economic consequences of the prime time television rule, and suggested that the views of the Department of Justice and the various public interest groups he obtained.

Pursuant to these suggestions, the Commission held further hearings which resulted in the retention of PTAR I, the withdrawal of PTAR II and the adoption of PTAR III which is now before us for review.[5] 50 F.C.C.2d 829.

## PTAR III

In PTAR III the Commission retains the original prime time access rule of PTAR I except for certain exemptions for network and off-network programming in cleared access time. The exemptions include: (1) One-half hour of 7 P.M. network news programs provided the station had carried one hour of local news before seven o'clock; (2) Sports runovers and special sports events such as New Year's Day football games; (3) on-the-spot news and political broadcasts. In addition, it grants an exemption in cleared access time for the showing of network or off-network programs designed for children of the age of 2 to 12, documentary programs and public af-

---

3. In practice, access time became 7 to 8 P.M. on week nights and generally 7–7:30 and 10–10:30 P.M. on Sundays, though one-hour shows are also played on Sundays.

4. "Off-network" programs are those which have played on the network, have finished their network run, and are thereafter sold in local markets.

5. On November 15, 1974 the Commission released a public notice announcing the specific provisions it proposed to incorporate into the Prime Time Access Rule beginning in September 1975. A formal decision to this effect was adopted on January 16, 1975 and the Second Report and Order was released the next day. Docket No. 19622, FCC 75–67, 29756, 50 F.C. C.2d 829 ("Second Report"). Commissioner Robinson dissented with a statement.

fairs programs.[6] PTAR III also amended the exclusion of feature films from cleared access time in a manner later to be described. The Commission, while not incorporating it as a rule, also admonished the stations not to use the exemptions for network programs during access time on Saturday, the night found most conducive thus far to local programming and hour-long access shows, except for "compelling public interest reasons." Second Report ¶ 34, 50 F.C. C.2d at 843–44. The Commission also stated its expectation that stations would devote an appropriate portion of access time, or at least of total prime time, to material (whether it be local, syndicated or network programming) that is particularly directed to the needs and problems of their respective communities and service areas, including the special needs of minority groups. Second Report ¶ 60, 50 F.C.C.2d at 852.

### The Parties and Their Positions

The petitioner, NAITPD, seeks review pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342 of portions of the Commission's PTAR III order amending 73.-658(k) of its Rules. NAITPD and two independent television producers favor the retention of the Prime Time Access Rule in its original form (PTAR I), but they object to the new exemptions.[7]

Divergent views on every aspect of the matter were presented to the Commission. The networks themselves are sharply divided. Of the three network intervenors, NBC and ABC support PTAR III, as well as PTAR I. CBS not only seeks to eliminate the amendments to the Prime Time Rule adopted in

PTAR III, but challenges the constitutionality of PTAR I itself. Westinghouse, which is not a network but, like the networks, owns five television stations, and which originally proposed the Rule, opposes the Commission only on PTAR III, but otherwise supports PTAR I. Warner Brothers and other motion picture producers seek to have any prime time access rule held unconstitutional. They also contend that if they are unsuccessful, the court should at least strike down the exclusion from access time of motion pictures which have played on a network.[8]

The Citizens Communications Center, which speaks for a number of public interest groups, strongly supports the original Prime Time Access Rule and opposes the incursions on cleared access time proposed in PTAR III. It urges us to invalidate the exemptions, not on constitutional grounds but rather as an irrational exercise of the rulemaking power.[9]

### I

### The Attacks on the Prime Time Access Rule

### (PTAR I)

We turn first to the attack on the Prime Time Access Rule itself. Warners and CBS, while recognizing that the constitutionality of the Prime Time Access Rule has been affirmed by this court in *Mt. Mansfield, supra,* stress that in our subsequent NAITPD opinion we stated that in *Mt. Mansfield,* "we recognized the experimental nature of the rule and warned that our holding did not preclude a further review of experience with the

---

6. The definition of these types of programs is discussed, *infra.* The exempted programs discussed appear to be primarily one-half hour programs although the rule itself would seem to allow a program running an hour.

7. A petition for review was also filed by Sandy Frank Program Sales, Inc., a third independent television producer, which takes the same position.

8. The Committee for Independent Television Producers supports the Warner position.

9. The Department of Justice Antitrust Division filed a brief expressing the view that the exemptions added to the rule and the failure to provide assurances of a fixed period will reduce the effectiveness of the Rule in promoting competition and diversity, but stating that the decision of the Commission is within its discretion, and recommending affirmance of PTAR III. The Office of Telecommunications Policy urged the Commission to repeal PTAR I.

rule if it proved to be inimical to the public interest." 502 F.2d at 252.

Warner contends that experience has shown the rule to be inimical to the public interest. They argue that experience since the adoption of the Prime Time Access Rule has demonstrated that it has not achieved its goals in the four years since it was adopted. Before we consider the arguments based solely on the alleged failure of the experiment, we turn to the broader attack on constitutional grounds that was considered in *Mt. Mansfield.*

### A. *The Mt. Mansfield Opinion*

█ In *Mt. Mansfield,* this court considered the general claims that the Prime Time Access Rule constitutes a direct restraint on speech and is therefore a violation of the First Amendment. We considered the argument that the restraint operates unconstitutionally on the network distributors whose products are barred for a half hour period, on the licensees whose freedom of choice is restricted, and on the viewer who is denied access to programming he might have preferred.

We decided against these general contentions in *Mt. Mansfield, supra.* There is no reason to reconsider them in the context of a broad attack under the First Amendment and under Section 326 of the Communications Act.[10] In *Mt. Mansfield* we recognized that First Amendment protection is applicable to the broadcast industry, United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), but that the peculiar characteristics of the broadcast media require the application of constitutional standards to their regulation which differ from those applicable to other types of communication. Red Lion Broadcasting Co., Inc. v. Federal Communications Commission, 395 U.S. 367, 386, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). We noted that technological factors in the broadcast industry make it impossible for all who wish to be broadcasters in particular markets to do so even when they have the means to make the substantial capital investment that is necessary in most cases. *Mt. Mansfield, supra,* 442 F.2d at 477, citing *Red Lion, supra,* 395 U.S. at 396–400, 89 S.Ct. 1794. Accordingly, "The First Amendment confers no right on licensees . . . to an unconditional monopoly of a scarce resource which the Government has denied others the right to use." 395 U.S. at 391, 89 S.Ct. at 1807.

We further recognized that in evaluating competing priorities for access to the airways, the public interest is paramount. See 395 U.S. at 390, 89 S.Ct. 1794. We also gave heed to the pronouncement that the First Amendment stems from the premise that "[t]he widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public. . . . .." Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). We thus concluded as follows:

"When viewed in the light of these principles, the prime time access rule, far from violating the First Amendment, appears to be a reasonable step toward fulfillment of its fundamental precepts, for it is the stated purpose of that rule to encourage the '[d]iversity of programs and development of diverse and antagonistic sources of program service' and to correct a situation where '[o]nly three organizations control access to the crucial prime time evening television schedule.'" *Mt. Mansfield, supra,* at 477.

We finally held that while the rule may well impose a very real restraint on licensees, the rule is designed, as a prac-

---

**10.** 47 U.S.C. § 326 provides:

"Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication."

tical matter, to open up the media for those whom the First Amendment primarily protects—the general public. We were supported in our conclusion by the circumstance that the Supreme Court had already upheld the Commission's limitation of the amount of "option time" for which an affiliate could contract, limiting the power of the networks in that respect to four programs on two affiliated stations.[11] N. B. C. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). We noted in *Mt. Mansfield*, also, that the "fairness" doctrine challenged unsuccessfully in *Red Lion, supra,* itself impinges on the right of the licensee to broadcast other programming because of the mandate to give fair coverage to discussion of public issues.[12]

We think *Mt. Mansfield* was correctly decided on the facts as they then appeared.

### B. *The Argument that PTAR I has failed*

The intervenors who oppose PTAR I train their arguments on the point that there actually has been a decrease in diversity of programming in access time in the past four years, and that PTAR I has actually increased network dominance, contrary to its stated purpose. They argue, accordingly, that the constitutional underpinning of *Mt. Mansfield* has disappeared.

The Commission considered these contentions, including the negative report of its own economist,[13] and, after hearings,

decided not to repeal the Prime Time Access Rule, but to retain it with the exemptions of PTAR III added.[14] The Commission commented, however: "Should the time come to review the rule again, it may well be that a continuing lack of diversity will be grounds for change; but we do not find it so now except as provided herein." Second Report ¶ 21, 50 F.C.C.2d at 838.

We are now asked to overrule the judgment of the Commission that the present lack of diversity is not enough to require repeal of the rule, and to assess the constitutional implications of that determination. We recognize, to be sure, that a policy may be held constitutional on the assumption of a valid legislative or agency purpose, and that upon default of the purpose, the policy may be revisited. The issue here is narrower, whether the revisit by the Commission itself and its apparently reasoned adherence to the scheme of PTAR I is subject to reversal by this court on First Amendment or other grounds.

In our review, we must start with the assumption that no matter how dedicated they may be to the "public interest" and no matter how sincere in their abhorrence of censorship, the parties advocate what they think is essentially in their own economic interest. It is the task of the Commission to find, as best it can, what is in the "public interest" amid the conflicting advocacy of that "public interest" by its several protagonists.

The extraordinary development of the television industry around a relatively

---

**11.** "Option time": —Network affiliation contracts usually contained "network optional time" clauses which required affiliates to broadcast particular programs in hours specified as "network time."

**12.** The "fairness doctrine" requires licensees to devote a reasonable amount of time to the discussion of controversial issues of public importance and to provide a reasonable opportunity for the presentation of contrasting points of view on those issues. The general "fairness doctrine" was held constitutional in *Red Lion, supra.* It is distinct from the statutory requirement of § 315 of the Communications Act, 47 U.S.C. § 315, that equal time be allotted to all qualified candidates for public office.

**13.** Economist's Final Report, "The Economic Consequences of the Federal Communications Commission's Part-Time Access Rule on the Broadcasting and Program Production Industries," by Alan Pearce, FCC Communications Economist, September, 1973, cited in dissenting opinion of Commissioner Robinson, 50 F.C. C.2d at 900 n.30.

**14.** Comments were filed by the Department of Justice and the Office of Telecommunications Policy, by 22 citizens of public groups, seven industry, professional and labor Associations, the three networks, seven station licensees, eight film companies and other program suppliers, including the joint presentation of Warner and the other Hollywood producers.

few frequencies on the spectrum makes for vigorous competition alongside governmentally licensed monopoly. The strongest competitors are the networks. Free speech in television is a balance between encouragement of access to the medium and the prevention of non-access to the medium. In view of the large sums of money needed to produce most half-hour programs, it can hardly be said that "free speech" is free. Free speech in broadcasting is a part of economics, and it is surely that since the broadcast license is a monopoly.

### C. *Lack of diversity of programming in access time*

It must have been understood, generally, when this court upheld PTAR I, that the Commission would not be able to wave a magic wand and conjure up independent producers with the imagination, resources, and bottom-line capacity to fill all the time slots of access time.

To the extent that the enormous resources of the networks were withheld from one hour of prime time, it was foreseeable that the cleared access time period would have to be filled with less lavish productions. While it is true that the cost of a production is not necessarily the true measure of its quality, it is unfortunately also true that many believe that the types of programs on access time deteriorate because the independent producers suffer from costs which are simply too high to support quality programs on a first-run syndication basis. Independent producers must pay distribution fees and secure acceptance in advance from local stations, advertisers and perhaps market research people. For commercial reasons, few of these groups are interested in trying the untried, the not so popular, or a program in the high cost bracket. As a result, independent producers have little incentive to exercise ingenuity.

The result has been, as could have been expected to some degree, that it is largely the cheaper productions, daytime fare, that have been put into cleared prime time slots. What was not anticipated by the Commission was the monotony of the product. A kind of Gresham's law seems to operate in first-run syndication—the cheaper tending to drive the dearer out of circulation. The fact is, as the Commission concedes, that the degree of diversity in programming for access time has been disappointing. In the entertainment area, the emphasis has largely been on game shows and animal shows, game shows constituting 41.9% of the 2,100 access half hours on 150 stations in one season. Second Report, App. C, ¶ C–51, 50 F.C.C.2d at 876. Comedies, dramas, and Westerns in access time have dropped significantly. Comedy has been virtually eliminated. The Commission notes a similar lack of diversity, however, with respect to the three networks themselves which all show a crime drama at the same hour in prime time, also giving the viewer no choice.

On the other hand, as the Commission found, and as the public *amici* stress, programs of local interest, on matters of concern to the people served by local stations, have begun to obtain a foothold on commercial stations in the access time period.[15] One may assume that in the long run game shows will pall to some extent and that independent producers will have to turn to more variegated fare if they wish to survive, but any prophecy on public taste, certainly by judges, would be hazardous indeed.[16]

We assume that there is a lack of diversity in access time programming. While Viacom and Worldvision, companies spun off from CBS and ABC under the "financial interest" rule, have apparently begun to develop distribution and

---

**15.** The public *amici* note that local programming is aided by PTAR because it takes from the affiliate station the excuse for resisting local demands by blaming it on the networks' control of all the prime time.

**16.** Since the argument of the appeal, Forbes Magazine has ventured the opinion that "[g]ame shows are popular because they are the liveliest viewing available. They win by default." April 1, 1975, p. 48.

financial facilities on their own, as independent successors to their parents, the scarcity of entirely new independent producers for first-run syndication is also troublesome. The Commission finds, however, that this lack is not necessarily fatal because the period of the access time experiment has been relatively short—four years. The Commission notes that during the first year of the rule, off-network productions still were allowed to compete and amounted to 23% of access time. Second Report ¶ 18, 50 F.C.C.2d at 837. The Commission also finds that the very uncertainty of the future of the Prime Time Access Rule was a factor that inhibited the growth of independent producers of quality programs "other than those most easily produced and readily saleable." Id. See also Second Report App. C, ¶ C–62, 50 F.C.C.2d at 880. In sum, the Commission has determined that the Prime Time Access Rule has not had enough unrestricted seasons to achieve its goals.[17]

D. *The argument that network "dominance" has increased under PTAR I*

■ The issue of whether network dominance has actually increased under PTAR I is peculiarly within the competence of the Commission, which has access to all phases of the industry and has conducted hearings not only under this docket but under related dockets as well. We cannot, as a reviewing court, determine *de novo* the relative weight of the several conflicting economic factors that should be considered.

Suffice it to say, it is obvious that control by the networks of three hours of prime time is less than control of four hours of prime time, and means less

domination so far as the affiliates are concerned. PTAR has no less resulted in a decrease in network domination if, as Warners contends, curtailment of network prime time has created a market of scarcity to the bargaining advantage of the networks against the producers. It may be true also, as Warners contends, that the networks are making more money than they did before PTAR I.

We note that while a purpose of PTAR I was to encourage independent production for access time, it was not to improve the position of the producers against the networks. Nor was there any intention to make the networks poorer. A rule adopted for the public interest in a regulated industry often makes some segments of an industry richer and some poorer. What is prohibited is that these be the goals. In the words of Mr. Justice Frankfurter, "The Communications Act was not designed as a code for the adjustment of conflicting private interests." Radio Corp. of America v. United States, 341 U.S. 412, 423, 71 S.Ct. 806, 95 L.Ed. 1062 (1951).

■ In sum, we do not find so abysmal a failure of purpose as to require us to say that what was constitutional has become unconstitutional, or that the result reached by the Commission is arbitrary and capricious, or against the "public interest" as a matter of law. Radio Corp. of America v. United States, *supra,* 341 U.S. at 420, 71 S.Ct. 806. "The public interest" is a long term conception. We cannot, even if we were competent to do so, substitute our own judgment on the viability of segments of the broadcast industry to serve the public interest in the long run for that of

17. The Antitrust Division noted in its letter response to the F.C.C. dated September 20, 1974:

"Thereafter, however, the prime time access rule never had a chance to become a stable element in the broadcast regulation environment. Adopted May 4, 1970, the rule was to be fully effective October 1, 1971. Four months after its adoption, however, the Commission on August 7, 1970, significantly amended the rule, delaying until October 1,

1972, the effective date of the off-network and feature films provisions. [25 F.C.C.2d 318 (1970) Appendix I]. On October 26, 1972, only twenty-five days subsequent to the revised rule's fully-effective date, the Commission initiated a further rule-making proceeding concerning possible modifications, repeal, or extension of the rule. [37 F.C.C.2d 900 (1972)]. In January, 1974, the Commission substantially amended the rule. [44 F.C.C.2d 1081 (1974)]."

the agency chosen by Congress to exercise its responsibility. The F.C.C. has been given rule-making power by Congress. Communications Act of 1934, Sections 1, 2, 4(i), 301, 303(b)(f)(g). 47 U.S.C. §§ 151, 152, 154(i), 301, 303(b)(f) (g). The F.C.C. has followed appropriate rule-making procedures. 5 U.S.C. § 553. It has given appropriate notice, and has invited the suggestions of interested parties, including the antitrust division and the public. It has written a reasoned opinion, accompanied by reasoned dissent. The opponents of the Prime Time Access Rule are not without points. Neither are its proponents. It may be that the Prime Time Access Rule is unwise, but if the contention is simply that the Rule is "not likely to succeed in accomplishing what the Commission intended, we can say only that the appellants have selected the wrong forum for such a plea." N.B.C. v. United States, *supra*, 319 U.S. at 224, 63 S.Ct. at 1013. There is no basis for abrogating the Rule unless we reverse the prophecy of the Commission on its long term effect. In this respect, the scope of our review is limited. We cannot say, at this time, that the Commission's underlying determination is arbitrary and capricious. We hold, accordingly, that the fundamental bases for the Rule already decided in the *Mt. Mansfield* opinion remain substantially unaffected by subsequent events as determined by the Commission.

The Commission has rejected the suggestion of some, including the antitrust division and the public *amici*, that the Prime Time Access Rule be given a fixed duration like five years, to give independent producers an incentive for investment. We are not unmindful that if PTAR III should fail to achieve diversity in the future, the very uncertainty of the duration of the Rule will again be blamed for the failure. Failure to adopt a fixed term, a policy choice with which we will not now interfere, cannot be used indefinitely as an excuse for lack of diversity of program and source. If PTAR fails after a reasonable time we would not be disposed to treat the lack of a fixed term

for the Rule, however, as a continuing excuse for its failure. "If time and changing circumstances reveal that the 'public interest' is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations." N.B.C. v. United States, *supra*, 319 U.S. at 225, 63 S.Ct. at 1013. The deleterious effect of the overhanging threat of revisitation may be lessened by an assurance from the Commission that a long enough lead time will be allowed to protect independent producers from adverse fundamental changes.

## II

*Are the amendments adopted in PTAR III in violation of the constitution or Section 326?*

■ We next come to the question of whether the amendments themselves, rather than the experience under PTAR I, affect the validity of the rule. We start with the assumption that this court in *Mt. Mansfield* never intended to put the Commission in a straitjacket. It was always implicit in the judgment that experience might require modification of the Prime Time Access Rule. It did, in fact, develop that the Commission thought a revisit to be necessary. The question before the F.C.C. was: Granted that PTAR I was not working as well as was anticipated, should it be repealed entirely or amended?

One solution might have been to recognize that one full hour of access time, even with exemptions, was just too much. This was the cardinal point of the abandoned PTAR II. If that had been the issue, it would have been hard to convince us that the simple curtailment of one half of the access time was a radical enough change to upset the entire rationale of the *Mt. Mansfield* opinion.

The Commission did not do this, however. Instead of an absolute curtailment of access time, the Commission decided upon a compromise, based upon the pleas of "public interest" by various groups

which had urged that the whole hour of access time remain cleared. We do not think that PTAR III was, as has been suggested, a compromise between competing economic interests. It was rather an attempt to preserve the three-fold purpose (1) of curtailing the licensee's dependence on the networks for product; (2) of affording an opportunity for diversity of programming; and (3) of encouraging new sources of production (and, one might add, of distribution).

The method chosen was well within the competence of the Commission. As Judge Learned Hand put it, we are not free to doubt "the putative proficiency of the Commission in its field." N.B.C. v. United States, 47 F.Supp. 940, 945 (S.D.N.Y.1942), aff'd, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Recognizing that the practical situation did permit the release of some time slots in access time, the Commission did not go all the way. Instead, it used the idea of opening time slots which appeared freeable, as bait to the stations to use, but only for program categories believed to be in the "public interest."

This is said to be in violation of the First Amendment. It is true that the Commission has never before considered what types of program may be played at particular times. And it may be that *mandatory* programming by the Commission even in categories would raise serious First Amendment questions. On the other hand, the general power of the F.C.C. to interest itself in the kinds of programs broadcast by licensees has consistently been sustained by the courts against arguments that the supervisory power violates the First Amendment. Office of Communication of the United Church of Christ v. F.C.C., 123 U.S.App. D.C. 328, 359 F.2d 994, 1006–09 (1966); Citizens Committee to Preserve Voice of the Arts in Atlanta v. F.C.C., 141 U.S. App.D.C. 109, 436 F.2d 263–72 (1970); Citizens Committee to Save WEFM v. F.C.C., 165 U.S.App.D.C. 185, 189–91, 506 F.2d 246, 250–52 (1974).

The Supreme Court has told us that "[t]his mandate to the FCC to assure that broadcasters operate in the public interest is a broad one, a power 'not niggardly but expansive.' National Broadcasting Co. v. United States, 319 U.S. 190, 219 [63 S.Ct. 997, 1010, 87 L.Ed. 1344] (1943)." Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 380, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).

The only way that broadcasters can operate in the "public interest" is by broadcasting programs that meet somebody's view of what is in the "public interest." That can scarcely be determined by the broadcaster himself, for he is in an obvious conflict of interest. "There is no·sanctuary in the First Amendment for unlimited private censorship operating in a medium not open to all." *Red Lion, supra,* 395 U.S. at 392, 89 S.Ct. at 1808. "It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." Id. at 390, 89 S.Ct. at 1806.

Since the public cannot through a million stifled yawns convey that their television fare, as a whole, is not in their interest, the Congress has made the F.C.C. the guardian of that public interest. All that the Commission can do about it is to encourage competitive fare. If a large segment of the public prefers game shows to documentaries, the Commission can hardly do more than admit paradoxically that taste *is* a matter for dispute. The Commission surely cannot do its job, however, without interesting itself in general program format and the kinds of programs broadcast by licensees. National Broadcasting Co. v. United States, *supra.* Thus, as we have seen, the F.C.C. was sustained when it abrogated by regulation the chain broadcasting clauses which forced network programs on affiliated stations. National Broadcasting Co. v. United States, *supra.* It was also given a free hand to tell the subscription television people what types of programs they must *not* broadcast in order to qualify for a license. See National Association of Theatre Owners v. F.C.C., 136 U.S.App.D.C. 352, 420 F.2d 194, 207–08 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970).

The Commission by this amendment of the rule is not ordering any program or even any type of program to be broadcast in access time. It has simply lifted a restriction on network programs if the licensee chooses to avail himself of such network programs in specified categories of programming. One may, of course, argue, as Warner does here, that free speech is indivisible, and if made available to one it must be made available to all. But the Supreme Court in CBS v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), has decided against a "right of access" system for television broadcasting. In *Mt. Mansfield* this court has sustained the exclusion of the networks from certain hours while, obviously, allowing access to others in the same hours.

The analogy sought to be drawn from Police Department of Chicago v. Mosely, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) is inapt. There, the Supreme Court struck down, largely on equal protection grounds, an ordinance that permitted only labor picketing in an area near a public school, saying that "any restriction on expressive activity because of its content" was impermissible. Id. at 96, 92 S.Ct. 2286. We do not have a comparable situation here. There are many differences between an absolute ban on certain speech-related activity in a forum where unlimited physical access is possible and a broad and flexible restriction on speech in a forum where only a limited number of persons may speak at one time. Under PTAR III, the station is still free to choose the game show over a panel on inflation. The non-labor pickets in *Mosely* had no similar freedom of choice.

Nor does the program *category* method of reconciliation of the public interest create "the risk of an enlargement of Government control over the *content* of broadcast discussion of public issues." CBS v. Democratic National Committee,

*supra*, 412 U.S. at 126, 93 S.Ct. at 2098 (emphasis added). While motion pictures are protected against censorship under the First Amendment, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), it would be folly not to recognize that their protection, except for censorship of content, is not as strong as is the protection in broadcasting invoked by the discussion of public issues. The public interest, in the general regulation of broadcasting, may require some sacrifice of an entertainment category for a public affairs category on a non-discriminatory basis.[18]

### The Pre-Censorship Issue

After the decision in *Mt. Mansfield,* the Commission had to pass upon waivers for specific network programs, said to be in the public interest, which desired to preempt access time. The decisions for or against waiver were made on an *ad hoc* basis, without any formulated regulations such as would be required in good administrative practice. The effect, undoubtedly, was a sense of uncertainty and frustration.

In PTAR III the Commission has now attempted to state certain categories for permissible intrusion by network programs on access time without recourse to the waiver procedure of the Commission. This codification has the advantage of a more soundly based rule of administrative procedure and a desirable accent on the licensee's freedom to control his own programming. As we have seen, the opening of access time slots to specific categories is not mandatory. If there should be untoward pressure on the stations by the networks, that can be duly reported.

Nor are the categories different in kind from the suggested classifications of programs long employed by the Commission to guide prospective licensees, as well as licensees seeking renewals, to recognize what sort of program

---

**18.** Thus, for example, the Supreme Court in N.B.C. v. United States, *supra*, 319 U.S. at 203, 63 S.Ct. at 1003, sustained the policy of the F.C.C. that "local program service is a vital part of community life."

balance is deemed by the Commission to be in the public interest.[19]

The F.C.C. has long been concerned with the amount of time spent on local self-expression, local talent, children's programs, political broadcasting, and service to minority groups. See En banc Programming Inquiry: Report and Statement of Policy, 44 F.C.C. 2303 (July 29, 1960).

The question, simply put, is whether permitting the same categories to encroach on access time on a purely voluntary basis is any more censorship than considering the use of the same categories as part of a test of whether a license should be renewed. Implicit in the power to license must be some power to regulate. See F.C.C. v. American Broadcasting Co., 347 U.S. 284, 289–90, n. 7, 74 S.Ct. 593, 98 L.Ed. 699 (1954).

The power to regulate broadcasting is, of course, limited by the First Amendment. The Commission may not take from the licensee the ultimate control, and the ultimate responsibility as well, for the actual content of particular programs within the broad categories promulgated to serve the public interest.

Nor does it purport to do so. The Commission has not used the carrot-and-stick approach. The newly exempted categories are more a function of the time factor than of editorial policy. The Commission realized that by cutting the networks to three rather than four hours of prime time through PTAR I, it had limited the diversity of programs that could be played in that more restricted prime time. What naturally fell by the wayside during prime time were the less commercially attractive programs including programs for children, documentary films and public affairs presentations.

The exemption of network children's programs is a rational development of the Commission's growing awareness of their importance. On October 24, 1974, in its Children's Television Report and Policy Statement, 31 Pike & Fischer R.R. 2d 1228, 1234, the Commission stated: "One of the questions to be decided here is whether broadcasters have a special obligation to serve children. We believe that they clearly do have such a responsibility. . . ."

The Commission found that PTAR I, by cutting prime time to three hours, had virtually eliminated programs for children at their best listening hour, 7–8 P.M. Since the independents had not provided significant children's programs in the access time, the Commission, of necessity, had to go back to the networks to achieve its children's program goal.[20] We cannot say the Commission used an improper standard in providing for the compromise in the "public interest."

It is suggested that the Commission should have elected to force the stations to carve out *network* prime time for these programs. Whether or not the Commission could have done this—a course that would doubtless have evoked constitutional protests from the networks—it is not for this court to say. Nor is it for this court to say that the Commission had, in any event, no right to choose between reasonable alternatives.

---

**19.** The public has an interest in diversity of entertainment formats. Thus, whether abandonment of a "progressive rock format" for "middle of the road music" is in the public interest requires a hearing in a proceeding to transfer a station license. Citizens Committee v. F.C.C., 141 U.S.App.D.C. 109, 436 F.2d 263 (1970).

**20.** The Commission found that there are only a small number of syndicated (1) children's programs (Second Report ¶ 30, 50 F.C.C.2d at 841); (2) public affairs programs (id. ¶¶ 32 and 38, 50 F.C.C.2d at 842); and (3) documentary programs (id. ¶¶ 33 and 38, 50 F.C.C.2d at 842–43, 845) in contrast to "the tremendous resources which the networks have for such [public affairs and documentary] programming" (id. ¶ 38, 50 F.C.C.2d at 845). Accordingly, assuming these types of programs to be in the public interest, they seem presently available only through the networks. If that condition changes, we assume the rule would change.

*The argument that the classifications are too vague*

The further claim is made that the classifications of programs are too vague to be constitutional, and that in the absence of clearer definition they place the licensee at his peril to interpret them.

We must weigh the relative vagueness of the standard against the practical sanctions for good faith error. In the field of broadcasting, program categories must remain somewhat vague to avoid the implication that the guideline is rigid enough to be censorial. On the other hand, a category should not be so undefinable that it would not be understood by an average licensee. "[O]nly what can reasonably be understood is demanded of the broadcaster." See Yale Broadcasting Co. v. F.C.C., 155 U.S.App.D.C. 390, 478 F.2d 594, 597, cert. denied, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973). Within the extremes, there will inevitably be some differences of opinion and shades of meaning. If it is proper for the Commission to require licensees to screen "drug oriented" songs, *Yale Broadcasting Co., supra,* it is proper to require them to screen for evasion of the exempt categories. When we deal, as the Commission must, with the worlds of the visual arts and of the intellect, too precise a series of definitions might end in a stylized format close to censorship.

■ In balancing the public interest against what we believe to be the exaggerated fears of licensees, we think that the narrow limitation the Commission has put on the three categories is a justifiable judgment in the public interest. The Commission disavows any power to regulate program *content.* Like King Canute, it seeks to assure its flattering courtiers that it really has no power to rule the waves.

Of the three new types of programs exempted, (1) "public affairs" program is not defined; (2) "programs designed for children" means "programs primarily designed for children aged 2 through 12" and (3) "documentary programs" means "programs which are non-fictional and educational or informational, but not including programs where the information is used as part of a contest among participants in the program, and not including programs related to the visual entertainment arts (stage, motion picture or television) where more than 50% of the program is devoted to the presentation of entertainment material itself." Second Report ¶ 28, 50 F.C.C.2d at 840.

■ Whether a particular program is a "public affairs" program is probably better defined by what such a program is not. To paraphrase Mr. Justice Stewart's comment on hard-core pornography, we think we know a "public affairs" program when we see it. Nevertheless, we direct the Commission to formulate a broad definition of "public affairs program" either in positive or negative terms. We confirm its right to give such programs the exemption here given as in the "public interest." "[T]he Commission is not powerless to insist that [licensees] give adequate and fair attention to public issues." *Red Lion, supra,* 395 U.S. at 393, 89 S.Ct. at 1808.

A "children's program" is a program "primarily designed for children aged 2 through 12." A precise definition is probably unattainable, and, indeed, undesirable. No one can set boundaries to the fantasy of a child's world. Adults brave enough to enter that domain must leave behind their sense of self-assurance. A conclave of all the advertising agencies and all the station managers could not speak with certitude for the children's world.[21] The exemption for network children's programs does not, by its terms, exclude fiction or drama, fairy tales or poetry, nor does it prescribe

---

**21.** The Commission itself has noted that "judgments concerning the suitability of particular types of programs for children are highly subjective. . . . We are concerned that an attempt at drafting such rules could lead to extreme results which would be unacceptable to the American public." FCC Report on Broadcast of Violent, Indecent and Obscene Material (FCC 75–202) (February 19, 1975), p. 2.

what is educational or informational.[22] It does not provide that if the rest of the family happens to be entertained as well, the program is no longer "primarily designed for children." Of course, other factors, such as a preponderance of shaving cream advertisements, might raise some doubt on that score.

While the description of the category may be attacked as too vague, a more sharply defined category probably would be attacked as an intrusion by the Commission upon program content.[23]

"Documentary programs" are recognizable as informational and educational. To avoid the obvious riposte that game shows are also informational and educational, the definition specifically excludes such shows, for the simple reason that there are already enough of them on access time, and it is not the intention to let the networks add some more. That is a reasonable approach.[24]

The second part of the definition is designed to deal with a possible loophole, the presentation of substantial amounts of what is regular entertainment programming in the form of a documentary concerning the entertainment industries. This limitation is simply to avoid subterfuge. It is rational, since the purpose is to make the time slots available for true documentaries.

If it were not true that advisory opinions on program *content* trench upon censorship, the easy solution would be to recommend that broadcasters avail themselves of 5 U.S.C. § 554(e) which allows the agency to "issue a declaratory order to terminate a controversy or to remove uncertainty." But such *ad hoc* decisions are not desirable because they suggest a system of censorship, and because the very absence of precise guidelines makes competitors suspicious that the Commission reaches its *ad hoc* decisions entirely at large.

■ Since it would not be in the public interest to institute what could become, in effect, a system of precensorship, we must leave it to the licensee himself to interpret the program categories in good faith. The history of license renewals by the F.C.C. has hardly been a history of arbitrary oppression. Banzhaf v. F.C.C., 132 U.S.App.D.C. 14, 405 F.2d 1082, 1095 (D.C.Cir. 1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). There is no reason for a licensee who is not out to cut corners to fear that severe sanctions will be imposed for good faith error. His hearing on license renewal will be full and subject to review. See United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). In any event, it is more in the public interest to let the licensee interpret the exemptions himself than to command what might become a system of precensorship. As the Chief Justice has commented, "The Commission's responsibilities under a right-of-access system would tend to draw it into a continuing case-by-case determination of who should be heard and when." C.B.S. v. Democratic National Committee, *supra*, 412 U.S. at 127, 93 S.Ct. at 2098 (1973). The Commission should not make the waiver procedure available to determine

22. To the extent that the Commission may imply that fiction is excluded, we see no rationale for such an exception. The suggested exclusion is not within the rule itself, however, and it is beyond our present competence to review.

23. Even the Commission's use of NBC's *Disney* program for illustration has been seized upon as excluding other types of children's programs. In fact, all the Commission said was that "in the networks' regular prime time schedules starting in January, 1975 it appears that only NBC's *Disney* program would come within this exception." Second Report, ¶ 31

n.25, 50 F.C.C.2d at 842. This is probably an unfortunate comment, but there has been no showing that there were other putative children's programs "in the networks' regular prime time schedules" that would also come within the exception.

24. The Commission has also been presented with figures to show that certain types of documentaries, costing from $250,000 to $400,000 for a single one hour program in direct costs alone, cannot be produced except if costs are recouped from a first network run. See presentation by Wolper, 44 F.C.C.2d 1081, 1127 (1974).

whether particular programs fall within the exempted categories.

### The Argument of Illegal Delegation

NAITPD makes the further contentions: (1) that the Commission, in its rule-making procedure, failed to find that the exemption of the three categories of PTAR III were in the "public interest;" and (2) that the Commission improperly delegated its power to declare the "public interest" to the networks and their affiliates.

We do not doubt that the entire tenor of the Second Report and Order was a finding by the Commission that PTAR III is in the "public interest".

■ The question of improper delegation is another matter. The rule itself—73.658 Affiliation Agreements and Network Program Practices—makes no improper delegation of the power to declare what is in the public interest. The Commission has itself declared what types of programs may be shown in access time in the "public interest". To give the licensee a choice of programs within specified categories is not to abdicate the function of declaring what is in the public interest. As we have seen, the Commission may not force programs on licensees.

■ A more serious question is raised, however, on the gloss that the Commission puts on its rule when it admonishes licensees not to use these exemptions for network programs during access time on Saturday, the night found most conducive thus far to local programming and hour-long access shows, except for "compelling public interest reasons." Second Report, ¶ 34, 50 F.C. C.2d at 843–44. There is no guideline to what such "compelling public interest reasons" would be, and the judgment of the licensee in that regard appears to be unfettered.

We do not think that the policing duty imposed upon the Commission under 47 U.S.C. § 307(d), as licensing authority, can be delegated to the licensee. We have seen that the licensee is himself prone to favor himself. He should not, in case of conflict, determine public interest. We think that for the sake of orderly regulation, the Commission must either withdraw its admonition concerning Saturday programs or make the exempted categories wholly unavailable to licensees in access time on Saturdays. The Commission cannot leave the choice of which is the best of two worlds to the discretion of the licensee for his private decision on what "compelling public interest reasons" may be.

Some of the parties have also pointed out inconsistencies in the reasoning of the Commission, and assumed that we, as a court, are competent to review these alleged inconsistencies of policy statement and substitute our judicial judgment for the policy conclusions of the Commission. Since there has been no showing of the probability that further economic information would permit a meaningful extrapolation of the *future* of the first-run syndication production based on given alternatives of action, we think the Commission has done a permissible job, in its "putative proficiency" in evaluating the known factors.

The Commission does not have to wait for evidence that can only be supplied by the future. As the Court said in Radio Corp. of America v. United States, *supra*, 341 U.S. at 420, 71 S.Ct. at 810 (footnotes omitted):

> "It is true that the choice between adopting standards now or at a later date was not free from difficulties. Moreover, the wisdom of the decision made can be contested as is shown by the dissenting opinions of two Commissioners. But courts should not overrule an administrative decision merely because they disagree with its wisdom. We cannot say the District Court misapprehended or misapplied the proper judicial standard in holding that the Commission's order was not arbitrary or against the public interest as a matter of law."

We recognize that the more network documentary programs, for example, are permitted in access time the less incen-

tive there may be for independents to produce this type of program against the powerful network competition.[25] We also recognize some inconsistency when the Commission defends the continuation of the Prime Time Access Rule on the ground that it has not been in effect long enough, and then uses the fact that the independents have up to now failed to produce adequate public affairs programs as a ground for permitting network intrusion into access time.

The answer is simply that the priority of competing public values is not decided either by legislatures or agencies through hard logic. A choice between two valid reasons for action does not result in a non-reason. Public policy is not like a single track where only one train can run at a time. "The court's responsibility is not to supplant [a] Commission's balance of . . . [competing] interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." See Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

This is not to imply that we think that the "public interest" concept is solely to stimulate sources rather than diversity of programming. Mere multiplication of sources, without contribution to diversity of programming, in the long run might not be in the "public interest." The development of competition, while desirable, is not the single goal for the Commission, as it may be for the Department of Justice.

### Off-Network and Feature Film Restrictions

█ The motion picture producers (Warner) attack the new rule that bars all "feature films which have previously appeared on a network." The Commission, at the same time, has lifted the "restriction on movies which have been shown by a station in the same market within a two year period. . . . If a movie has never appeared on a network, it may now be presented during the access hour, regardless of when or whether it has ever appeared on a station in the same market." Second Report and Order ¶ 50, 50 F.C.C.2d at 848–49.

The line is drawn, then, between movies that have ever been broadcast on a network, which are barred from access time, and movies which have been broadcast only on a local station, even within the past two years, as well as movies that have played only in theaters, which are allowed.

We face the question whether this distinction between categories of playable movies in access time is arbitrary. If the purpose were to cut down on network domination of affiliated stations, that would have already been done, so far as off-network product is concerned, by the "financial interest" and "syndication" rules adopted with PTAR I. Under those rules, the off-network rights of syndication, including feature films (after the network run), have been assigned to independent distributors. The networks themselves are no longer engaged in the off-network syndication of motion pictures.

The only reason advanced for the restriction of the off-network product from access time, accordingly, is that, otherwise, the availability of such time to sources of new non-network material would be curtailed. This is logically true as well for films that have played on a network. If the purpose is simply to free access time for independent production, however, the Commission has given no reason why movies that have never appeared on network, including films directly after theatrical first run, are less of a threat to the success of the access time concept than movies that have. It seems to us that feature films are a sufficiently different category of entertainment from other forms of entertainment

---

**25.** On the other hand, independent producers can also aim for network prime time which is not closed to them.

so that any restriction should not depend, viewed solely as a competitive threat to access time, upon whether the film played network or local market or theatrically, in its debut.[26]

If feature films that have never played network are permitted to play cleared access time without let or hindrance, it is not rational to exclude similar feature films simply because they have once played network. Because of the financial interest and syndication rules, the networks no longer control the off-network distribution of either type of feature film. The historical antecedents of the motion picture are, in both cases, irrelevant to present network control. And it is arbitrary and capricious to say that either type of motion picture is more harmful than the other to the access time concept.

The desire to stimulate first-run syndication production of programs other than movies can, on the other hand, afford a rational basis for the exclusion of such off-network programs from access time. The running time of such programs is shorter than a feature film which has to encroach upon other time periods, and, as such, these off-network programs are serious competition and tend to preempt new product specially produced. At least, we cannot say that the decision to bar off-network programs, other than movies, is arbitrary and capricious in the light of the policy goals of the Commission.

In sum, feature films have had only a very small impact in the past on prime time.[27] One reason may be the 90–120 minute length of the feature film. At present it appears blocked out of access time in many markets by the local news programs that precede access time, and by the expensive prime time that comes after it.[28] If conditions should become more receptive for movies in this time area, there are presumably still enough movies that have never been shown on a television network to compete with independent programs for access time. There is no reason, therefore, to bar one class of movies and permit another class to be shown. The differential treatment of feature films adopted by the Commission is arbitrary. Accordingly, so long as the F.C.C. permits movies never seen on a television network to be played in cleared access time it must also permit movies which have been shown on network to be played in that time.

With the exceptions noted in this opinion we deny the petitions to review on the ground that the Rule as amended is not arbitrary and capricious or against public interest as a matter of law. Radio Corp. of America v. United States, supra, 341 U.S. at 420, 71 S.Ct. 806, 95 L.Ed. 1062, and we affirm the Commission. We cannot compel the Commission to adhere to its Order, PTAR III, with parts of it deleted by this court, however. We must, therefore, remand for further consideration by the F.C.C. in conformity with this opinion. See F.C.C. v. Pottsville Broadcasting, 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656 (1940); F.P.C. v. Idaho Power Co., 344 U.S. 17, 20–21, 73 S.Ct. 85, 97 L.Ed. 15 (1952); National Ass'n of Motor Bus Owners v. F.C.C., 460 F.2d 561, 565–66 (2 Cir. 1972).

In view of the remand, with which the Commission should deal expeditiously, we leave it to the Commission to rede-

---

**26.** In PTAR II the Commission had recognized that the distinction between movies based on where they had been shown "was artificial at best" and had removed restrictions on all movies from the 7–7:30 P.M. time slot and had barred all movies from the 7:30–8 P.M. time slot. See 44 F.C.C.2d at 1136.

**27.** For ten years before the adoption of PTAR I first-run film syndication had also been virtually non-existent in prime time. See 25 F.C.C.2d 318, 322 (1970).

**28.** The Commission noted that "movies occupied only 4.5% of access-period time in 1972–73, and only 7.1% in 1971–72." FCC Report and Order, Feb. 6, 1974, 44 F.C.C.2d 1081, 1119. In 1973, only three top-50-market affiliated stations presented local movies on five week nights from 6:30 to 8 P.M. Two of these were owned by a network, ABC. Ibid., at 1156.

termine when its modified Rule is to become effective.

The Commission should consider, in conjunction with its new effective date, a ceiling on total hours allowed for the exempted network programs in the light of the number of independent programs for first-run syndication then available for early production.

This panel will retain jurisdiction for review of the effective date fixed and matters related thereto.

Remanded to the F.C.C. for further consideration in conformity with this opinion.